78 Cal.Rptr.2d 110 (1998)
66 Cal.App.4th 458
In re JOSHUA M., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
DAVID P., Defendant and Appellant.
No. D029548.
Court of Appeal, Fourth District, Division One.
September 1, 1998.
Review Denied November 24, 1998.
*112 Kimberly A. Knill, Laguna Beach, under appointment by the Court of Appeal, for Defendant and Appellant.
John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, Kathryn E. Krug, Deputy County Counsel, for Plaintiff and Respondent.
Christopher Blake, San Diego, under appointment by the Court of Appeal, for Minor.
Certified for Partial Publication.[1]
HALLER, Associate Justice.
David P., the father of Joshua M., appeals from a juvenile court order that denied him reunification services under Welfare and Institutions Code[2] section 361.5, subdivisions (b)(10) and (12). David contends the denial of services constituted an unfair retroactive application of these newly enacted provisions that denied him due process. He further contends section 361.5, subdivision (b), violates constitutional protections of due process and equal protection because it discriminates against those individuals who cannot afford to pay for private reunification services.
David also argues the court abused its discretion in denying him visitation with Joshua.

PROCEDURAL AND FACTUAL HISTORY

Background
This is the second dependency proceeding for Joshua, who was born on July 21, 1992. Joshua is the son of David and Tina M. David and Tina also are the birthparents of another boy, born on August 21, 1990, who tested positive for methamphetamine at birth and became a dependent child. David was incarcerated at the time. The parents failed to reunify, and, on December 1, 1992, their parental rights were terminated as to the older boy, who was adopted by his foster mother.
In Joshua's first dependency proceeding, the Department of Social Services (Department) filed a petition under section 300, subdivisions (b) and (g), on August 23, 1993. The petition alleged Joshua had been residing with Tina in a hotel room full of electrical appliances that posed a danger to him, he had attempted to put his hand in boiling water and his parents were incarcerated and unable to arrange care for him.
Joshua was declared a dependent after David and Tina submitted on the petition and the court found the allegations true. Custody was removed from the parents, who were ordered to comply with a reunification plan. David's plan required him to complete a parent education program, attend therapy, participate in a 12-step substance abuse program and drug test.
David had completed a number of the requirements of his reunification plan while incarcerated. Joshua was ordered detained with David on May 5, 1994, on the condition David cooperate with family preservation workers, continue to drug test for an additional 60 days, and enroll in, attend, and complete an anger management course.
Although David's subsequent compliance with his reunification plan was uneven, the social worker reported Joshua appeared to adjust well to David's care. At the time of the six-month review report, the Department was considering recommending jurisdiction be terminated, but David was arrested in December 1994, and Joshua was placed in foster care again.
After Tina's release from custody in April 1994, her whereabouts were unknown for several months. However, in the first two months of 1995, Tina complied with the requirements of her reunification plan, and the Department recommended detaining Joshua *113 with Tina. In October 1995, the court issued exit orders awarding Tina physical custody of Joshua and David supervised visits with a neutral party; David was restrained from having any other contact with Tina or Joshua.
David was arrested in October 1995 for receiving stolen property. Upon conviction, he was sentenced to 16 months in prison. On December 16, 1995, a baby girl, Gina P., was born to David and his girlfriend, Regina P. David was released from prison on August 6, 1996.
David was arrested again on December 17, 1996, after he threatened to beat up Regina and ripped the telephone out of the wall. He pled guilty to a felony count of making terrorist threats.[3]
On May 4, 1996, Tina was arrested for public intoxication and possession of a controlled substance; she was released on May 7. Tina was arrested on October 28, 1996 and subsequently convicted of burglary. Upon her arrest, Tina left Joshua with a roommate; they were living in a motel room. Later, Joshua's 18-year-old half-sister, Cyrene M., took him in. Joshua had a bad case of head lice. Cyrene repeatedly advised Tina that she was unable to care for her halfbrother.

Joshua's Current Dependency Proceeding
By January 1997, Cyrene could no longer care for Joshua, and the Department took Joshua into protective custody on January 8, 1997. At the time, Joshua was in soiled clothing, and he had visible cavities in his teeth. Subsequently, a dentist found five cavities requiring two root canals. Also, it was later determined that Joshua was suffering from two types of parasitic infections. Although he was four and one-half years old, Joshua did not recognize colors, shapes or letters.
On January 13, 1997, the Department filed a petition alleging under section 300, subdivision (b):
"On or about and between 10/01/96 to present, the child's mother left the child inadequately attended and inadequately supervised in that when the mother was incarcerated in October, 1996, the mother left the child in the care of his then 18 year old sibling, Cyrene [M.], who has been unable to cope with and appropriately care for the child. Cyrene [M.] has on several occasions advised the mother that she is unable to care for and cope with the child but the mother has failed to make other arrangements for the child's care and there is substantial risk the child will suffer serious physical harm or illness,"
and under section 300, subdivision (g):
"On or about January 8, 1997 to present, the whereabouts of the father was not known and reasonable efforts to locate the father have been unsuccessful, and the mother was incarcerated and unable to arrange appropriate and adequate care, and the relative or other adult custodian having physical custody of the child is not able and/or willing to continue providing care."
David, who was in local custody, was present at a dependency hearing on February 13, 1997, and the court permitted him to have telephone contact with Joshua. David asked the social worker to personally read his letters to Joshua because David did not trust the foster mother to do so, but the social worker did not receive any letters from David while he was in custody.
David was released from custody on March 27, 1997, and resumed living with Regina. On April 1, David tested positive for methamphetamines.
On April 28, 1997, Department filed an amended petition on behalf of Joshua, adding the following allegations concerning David under section 300, subdivision (b):
"The father is unable to provide safe, appropriate and regular care for the child in *114 that, including but not limited to, custody orders direct the father is to have only supervised visits with the child; the father has a history of substance abuse and tested positive for methamphetamines on or about 04/01/1997; between 02/01/1997 and 02/19/1997 the father's girlfriend, Regina [P.], who lives with the father, used methamphetamine and marijuana to excess which rendered her unable to provide regular care for Joshua's half-sibling Gina [P.]; in December 1996 the father and Regina [P.] were involved in a domestic confrontation which resulted in the father's incarceration. As a result, there is substantial risk the child will suffer serious physical harm or illness."
The amended petition contained the following allegation concerning David under section 300, subdivision (g):
"On or about 01/08/1997 to present, the mother, who is the child's custodial parent, was incarcerated and unable to arrange appropriate and adequate care, and the relative or other adult custodian having physical custody of the child is not able and/or willing to continue providing care and, pursuant to custody orders entered by the San Diego County Juvenile Court in October 1995, the father is only permitted supervised visitation with the child."
On April 29, 1997 and May 12, 1997, David tested positive for marijuana. On May 29, 1997, David was arrested for possession of methamphetamine and a syringe.
At the June 13, 1997 jurisdictional hearing, Tina submitted to the allegations of the petition. David, who was present with counsel, contested jurisdiction. Social worker Elizabeth Morgan testified she did not place Joshua with David after David was released from custody because of her concerns about his ability to care for the minor. She cited David's criminal history, drug use, domestic violence with Regina, his positive drug tests and the child protective services history. The court sustained both counts of the petition by clear and convincing evidence.
The contested dispositional hearing was held on four days in August 1997.[4] The foster mother testified David had called once and sent two letters. Joshua was willing to talk to David but he was not very responsive. Joshua said he did not want to visit his parents.
Joshua's therapist, Debbie Brown, testified that during play therapy Joshua showed fear of David and talked about violence he had witnessed between David and Tina and/or Regina. The most important issue for Joshua, who had been in nine placements, was a sense of trust that adults will take care of him and protect him, according to Brown. Brown opined David should undergo therapy to gain an understanding of his impact on Joshua; visitation between David and Joshua would be appropriate after David's therapist indicated David could interact appropriately with Joshua. Brown also said visitation should begin in a safe environment.
Social worker Morgan recommended neither Tina nor David receive reunification services. With respect to David, Morgan cited his long-term and continued drug use, frequent incarcerations and unstable life-style. Morgan testified David lied to her and accused her of "wanting to adopt his son away from him."
There was also testimony regarding David's attempts to treat his substance abuse and other problems that led to the removal of Joshua's older half-brother in 1990. Sharon Lubert, the social worker on the 1990 dependency case, testified upon David's release from prison in August 1991 he participated in reunification services for only a few weeks. David initially was to drug test at San Diego Health Alliance, but that was changed because of his work schedule. David was supposed to test at North Inland Recovery Center, which had later hours, but he never went there. Lubert gave David referrals to drug rehabilitation programs, but he never enrolled in one.
Jacquie Ayadi, the supervising social worker in Joshua's first dependency proceeding, testified that in May 1994 Joshua was detained *115 with David, who had been receiving services in prison, even though David had tested positive for cocaine in March 1994. At one point, the Department could not locate David and Joshua. By December 1994, David was no longer participating in his maintenance plan.
Morgan testified she had no evidence David had completed a drug program since Joshua's first dependency. Morgan also stated David was offered a reunification plan in Gina's dependency case, which was ongoing, and he continued to test positive for drugs.
The court declared Joshua a dependent and removed custody from the mother as custodial parent and from David as the noncustodial parent requesting custody. The court found by clear and convincing evidence that reasonable efforts had been made to prevent removal from the parents.
Pursuant to section 361.5, subdivisions (b)(10) and (12), the court ordered no reunification services were to be provided to David. Services were to be provided to Tina if she wanted them.
On September 15, 1997, the court ordered a specific reunification plan for Tina. The court also ordered no visitation for David would occur until the child's therapist determined it was in Joshua's best interest. The court also gave the social worker the discretion to permit telephone and letter contact with the concurrence of Joshua's therapist.

DISCUSSION

I. Denial of Reunification Services

David contends it was error to deny him reunification services under section 361.5, subdivisions (b)(10) and (12), because these newly-enacted statutory provisions were unfairly applied to him retroactively. David also contends section 361.5, subdivision (b) is invalid because it discriminates against people who cannot afford reunification services, thereby violating constitutional guarantees of due process and equal protection under the law.

A. The Statutory Provisions

Notwithstanding the crucial role of reunification services when a child is removed from the home (see In re Jamie M. (1982) 134 Cal.App.3d 530, 545, 184 Cal.Rptr. 778), the Legislature, by enacting section 361.5, subdivision (b), has discerned "it may be fruitless to provide reunification services under certain circumstances." (In re Rebecca H. (1991) 227 Cal.App.3d 825, 837, 278 Cal.Rptr. 185; see also Deborah S. v. Superior Court (1996) 43 Cal.App.4th 741, 750, 50 Cal. Rptr.2d 858.) In Deborah S. v. Superior Court., supra, 43 Cal.App.4th at page 751, 50 Cal.Rptr.2d 858, the Court of Appeal noted: "Inherent in this subdivision appears to be a very real concern for the risk of recidivism by the parent despite reunification services."
As originally enacted in 1986, section 361.5, subdivision (b), provided the court had the discretion not to order reunification services, if it was shown by clear and convincing evidence that: the parent's whereabouts were unknown; the parent suffered from a mental disability rendering him or her incapable of using the services; the child, who previously was adjudicated a dependent as a result of physical or sexual abuse, was being removed from the home a second time because of additional physical or sexual abuse; the parent had caused the death of another minor through abuse or neglect; or the child was under the age of 5 and had suffered severe physical abuse. (Stats.1986, ch. 1122, § 13, pp. 3984-3986.)
At issue here is 1996 legislation that expanded the number of circumstances under which the juvenile court can deny reunification services. (Stats.1996, ch. 1083, § 2.5, pp. 5871-5872.) In particular, we are concerned with section 361.5, subdivisions (b)(10) and (12), which provides:
"(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following:
". . . . .
"(10) That (A) the court ordered a permanent plan of adoption, guardianship, or long-term foster care for any siblings or *116 half-siblings of the minor because the parent or guardian failed to reunify with the sibling or half-sibling after the sibling or half-sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a), or (B) the parental rights of a parent or guardian over any sibling or half-sibling of the minor had been permanently severed, and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling of that minor from that parent or guardian.
". . . . .
"(12) That the parent or guardian of the minor has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior treatment for this problem during a three-year period immediately prior to the filing of the petition which brought that minor to the court's attention, or has failed or refused to comply with a program of drug or alcohol treatment described in the case plan required by Section 358.1 on at least two prior occasions, even though the programs identified were available and accessible."
Subdivisions (b)(10) and (12), became effective January 1, 1997.

B. Retroactivity

David contends it was reversible error to deny him reunification services under section 361.5, subdivisions (b)(10) and (12), based on conduct which occurred before the effective date of these provisions. The contention is without merit.
Under section 361.5, subdivisions (b)(10) and (12), reunification services may be denied if a parent was unsuccessful in reunifying with a sibling or half-sibling or unsuccessful in treatment of a long-standing substance abuse problem. Both provisions, therefore, rely upon the parent's past failure to either reunify with the child's sibling or comply with a substance abuse program.
Joshua's second dependency petition was filed on January 13, 1997, approximately two weeks after subdivisions (b)(10) and (12) became effective. Thus, the relevant question is whether David's past conductconduct that occurred before the law was in effectcan properly be used to cut off his reunification services.
The answer is yes.
"It is well settled that `[a] statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence before the enactment.' [Citation.]" (Armstrong v. County of San Mateo (1983) 146 Cal.App.3d 597, 613, 194 Cal.Rptr. 294.)
The statute's reliance upon antecedent events or conduct is analogous to recidivism provisions in the Penal Code, such as the Three Strikes law and other habitual offender laws, that enhance punishment because the defendant has committed other crimes in the past.
"In the context of habitual criminal statutes, `increased penalties for subsequent offenses are attributable to the defendant's status as a repeat offender and arise as an incident of the subsequent offense rather than constituting a penalty for the prior offense." (People v. Jackson (1985) 37 Cal.3d 826, 833, 210 Cal.Rptr. 623, 694 P.2d 736, overruled on different grounds in People v. Guerrero (1988) 44 Cal.3d 343, 355, 243 Cal.Rptr. 688, 748 P.2d 1150.)
As the court noted in People v. Venegas (1970) 10 Cal.App.3d 814, 823, 89 Cal.Rptr. 103, "A statute is not retroactive in operation merely because it draws upon facts antecedent to its enactment for its operation."
David's principal argument is that statutes are prospective rather than retroactive[5] unless the Legislature clearly intends *117 retroactivity. We have no quarrel with this premise, which correctly states general law. (See Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148, 153, 233 Cal.Rptr. 308, 729 P.2d 743.) However, in this case the argument is unavailing as we conclude the Legislature clearly intended section 361.5, subdivisions (b)(10) and (12), to be triggered by prior dependency proceedings or other events occurring before these provisions were enacted.
Section 361.5 reflects the Legislature's desire to provide services to parents only where those services will facilitate the return of children to parental custody. The exceptions in subdivision (b) to the general mandate of providing reunification services "demonstrate a legislative determination that in certain situations, attempts to facilitate reunification do not serve and protect the child's interest." (In re Baby Boy H. (1998) 63 Cal.App.4th 470, 474, 73 Cal.Rptr.2d 793.) Certainly, it cannot serve a child's best interest to unnecessarily prolong the lengthy dependency process when there is no chance of successful reunification because of circumstances that make it "fruitless to provide reunification services...." (In re Rebecca H., supra, 227 Cal.App.3d at p. 837, 278 Cal.Rptr. 185.)
Furthermore, in construing legislative intent, it is important to consider all sections of the statute. (Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230, 110 Cal.Rptr. 144, 514 P.2d 1224.) Section 361.5, subdivision (a) requires the provision of reunification services to parents. Subdivision (b) lists various circumstances in which the requirement need not be met. Subdivision (c) provides guidance to the court in determining whether reunification services are likely to succeed.[6]
Subdivision (c) explicitly permits the juvenile court to consider such antecedent conduct as "failure to respond to previous services" or "a past history of violent behavior" in deciding whether reunification services are likely to be unsuccessful in the current dependency proceeding. Thus, the Legislature, in fashioning limitations to the general mandate of providing reunification services, has historically included antecedent events or past behavior as legitimate criteria.
Our interpretation of section 361.5, subdivisions (b)(10) and (12)that the Legislature intended these provisions to be triggered by prior dependency proceedings that occurred before January 1, 1997thus gives effect to, and harmonizes, all parts of section 361.5, including subdivision (c). (Moyer v. Workmen's Comp. Appeals Bd., supra, 10 Cal.3d at p. 230, 110 Cal.Rptr. 144, 514 P.2d 1224.) Also, our interpretation of subdivisions (b)(10) and (12) in the context of the rest of the statute does not yield an absurd or arbitrary result. (DeYoung v. City of San Diego (1983) 147 Cal.App.3d 11, 18, 194 Cal. Rptr. 722.) Moreover, the basic purpose of section 361.5, subdivision (b)to limit reunification services to situations where they are likely to be successfulwould be frustrated by a construction that did not take into account a parent's historical circumstances, such as past failures of the parent in previous dependency proceedings.
Further, in an era of limited resources it is not only reasonable but prudent as well to focus reunification efforts on those cases most likely to succeed. (See Raymond C. v. Superior Court (1997) 55 Cal.App.4th 159, *118 164, 64 Cal.Rptr.2d 33 [when one of the exceptions in subd. (b) applies, the general rule favoring reunification is replaced by legislative assumption that offering services would be unwise use of government resources].) Therefore, "as a matter of public policy, this exception to the general rule favoring reunification services appears neither absurd nor arbitrary." (Deborah S. v. Superior Court, supra, 43 Cal.App.4th, at p. 751, 50 Cal.Rptr.2d 858, citing Cossack v. City of Los Angeles (1974) 11 Cal.3d 726, 733, 114 Cal.Rptr. 460, 523 P.2d 260.)
In sum, there was no impermissible retroactivity in applying section 361.5, subdivisions (b)(10) and (12), to Joshua's dependency even though the circumstances that activated these provisions took place before January 1, 1997. Contrary to David's position, the critical date is not that of the antecedent events or behaviors that trigger subdivisions (b)(10) and (12), but rather the date the current dependency petition was filed.
David also argues the retroactive application to his past conduct constituted a denial of due process because he was not timely informed that termination of his parental rights as to Joshua's brother could later deny him reunification services for any subsequent dependent child.
Procedural due process focuses upon the essential and fundamental elements of fairness of a procedure that would deprive an individual of important rights. As stated in Fuentes v. Shevin (1972) 407 U.S. 67 at page 80, 92 S.Ct. 1983, 32 L.Ed.2d 556:
"... the central meaning of procedural due process [is] clear: `Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' [Citations.] It is equally fundamental that the right to notice and an opportunity to be heard `must be granted at a meaningful time and in a meaningful manner.' [Citation.]"
Initially, we observe subdivision (c) of section 361.5 (see fn. 6, ante) provides for procedural safeguards. Further, we agree with In re Baby Boy H., supra, 63 Cal. App.4th 470, 73 Cal.Rptr.2d 793, in which the Court of Appeal rejected a due process attack on section 361.5, subdivision (b)(10).
"[A]ppellant's position that this subdivision creates an irrebutable presumption of inability to parent based on prior court orders and dramatically increases the risk of erroneous deprivation of parental rights is unfounded. Rather, it is the person's current parenting skills, examined in light of a heightened standard of proof, which determine whether the child will be adjudged a dependent." (Id. at pp. 477-78, 73 Cal. Rptr.2d 793.)
We find this reasoning persuasive and adopt it.

II. Is Section 361.5, subdivision (b) Constitutional?

David contends section 361.5, subdivision (b), violates constitutional guarantees of due process and equal protection because it discriminates against indigent parents who cannot afford to pay for reunification services on their own and thereby have virtually no chance to reunite with their children as opposed to non-indigent parents who can pay for private services if the government services are denied. David's argument is based on a recent United States Supreme Court case, M.L.B. v. S.L.J. (1996) 519 U.S. 102 [117 S.Ct. 555, 136 L.Ed.2d 473], which held the appeal of an order terminating parental rights cannot be conditioned on the appellant's prepayment of record preparation fees. Before addressing David's specific constitutional argument,' we shall set forth the relevant principles of constitutional law and demonstrate section 361.5, subdivision (b) is constitutional on its face.

A. Relevant Constitutional Principles

Our Supreme Court has discussed constitutional rights in the juvenile dependency context as follows:
"The federal and state Constitutions guarantee that no state shall deprive any person of life, liberty or property without due process of law. [Citation.] A parent's interest in the companionship, care, custody and management of his children is a compelling one, ranked among the most basic *119 of civil rights. [Citation.] Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.] The interests of the parent and the child, therefore, must be balanced.
"Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable or arbitrary legislation. [Citation.] In substantive due process law, deprivation of a right is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation that is reasonably applied; that is, the law must have a reasonable and substantial relation to the object sought to be attained. [Citation.]" (In re Marilyn H. (1993) 5 Cal.4th 295, 306-307, 19 Cal.Rptr.2d 544, 851 P.2d 826.)
Under the equal protection clause, "[a] classification `must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" (Reed v. Reed (1971) 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225.) However, only where the state has adopted "a classification that affects two or more similarly situated groups in an unequal manner" are equal protection rights implicated. (In re Eric J. (1979) 25 Cal.3d 522, 530, 159 Cal.Rptr. 317, 601 P.2d 549, italics omitted.)

B. Section 361.5, subdivision (b) Is Constitutional On Its Face

In assessing the constitutionality of section 361.5, subdivision (b), we consider its purpose and how it operates within the context of the statutory scheme.
We conclude subdivision (b) of section 361.5 comports with due process. With respect to procedural due process, section 361.5, subdivision (c) requires the court to hold a dispositional hearing and the probation officer to submit a report on whether reunification services should be provided. As to substantive due process, subdivision (b) represents a reasonable and rational means to advance a prime purpose of juvenile court lawproviding protection and stability to dependent children in a timely fashionby efficiently allocating scarce reunification services.
As the Court of Appeal in In re Baby Boy H., supra, 63 Cal.App.4th at page 478, 73 Cal.Rptr.2d 793, observed:
"The exception at issue here, section 361.5, subdivision (b)(10), recognizes the problem of recidivism by the parent despite reunification efforts. Before this subdivision applies, the parent must have had at least one chance to reunify with a different child through the aid of governmental resources and fail to do so. Experience has shown that with certain parents, as is the case here, the risk of recidivism is a very real concern. Therefore, when another child of that same parent is adjudged a dependent child, it is not unreasonable to assume reunification efforts will be unsuccessful. Further, the court may still order reunification services be provided if the court finds, by clear and convincing evidence, that reunification is in the best interests of the child. (§ 361.5, subd. (c).)"
In In re Christina A. (1989) 213 Cal.App.3d 1073, 261 Cal.Rptr. 903, the Court of Appeal upheld the constitutionality of section 361.5, subdivision (b)(2), which permits the cut-off of reunification services if the parent is mentally incapable of utilizing such services. With respect to the equal protection claim, the Court of Appeal observed:
"[A]ppellant's argument is that the classification of parents with dependent children into those provided with reunification services and those to whom such services are not extended, is invidious and discriminatory. The equal protection clause requires some rationality in the nature of the class singled out and requires that the distinctions drawn have `"some relevance to the purpose for which the classification is made."' [Citations.] (Rinaldi v. Yeager (1966) 384 U.S. 305, 309, 86 S.Ct. 1497, 16 L.Ed.2d 577.)

*120 "We perceive no improper purpose underlying the statute. The stated purpose of section 361.5, subdivision (b) is to exempt from reunification services those parents who are unlikely to benefit. This purpose is related to that of the juvenile law itselfto ensure the well-being of children whose parents are unable or incapable of caring for them by affording them another stable and permanent home within a definite time period. Although the goal of the juvenile law is to reunite children with their parents whenever possible, this reunification must be accomplished within 18 months from the time the child is originally taken from his or her parents' custody. (§ 366.25, subd. (a).) This strict time frame, in turn,, is a recognition that a child's needs for a permanent and stable home cannot be postponed for an extended period without significant detriment. (See § 352; 1 Goldstein, Freud and Solnit, Beyond the Best Interests of the Child, pp. 42-43; In re Micah S. (1988) 198 Cal. App.3d 557, 566, 243 Cal.Rptr. 756 [Brauer, J., conc.].)
"It is apparent that section 361.5, subdivision (b) bears a rational relation to these purposes. It is reasonable for the state, before expending its limited resources for reunification services, to distinguish between those who would benefit from such services and those who would not." (In re Christina A, supra, 213 Cal.App.3d at pp. 1079-1080, 261 Cal.Rptr. 903.)
We agree with the reasoning of Christina A. and adopt it.

C. Is Section 361.5, subdivision (b) Constitutional in Light of M.L.B. v. S.L.J.?

In M.L.B. v. S.L.J., supra, 519 U.S. at page 107, 117 S.Ct. at page 559, the United States Supreme Court held a state violates due process and equal protection when it conditions appeals from trial court orders terminating parental rights on the affected parent's ability to pay record preparation fees.
After petitioner's parental rights to two minor children were terminated, she sought to appeal the termination decree but the State of Mississippi required she pay in advance record preparation fees estimated at $2,352.36. Petitioner's appeal was dismissed because she lacked the money to pay the fees. (Ibid.)
In ruling that Mississippi may not block an indigent parent's access to an appeal of a parental termination order because of her poverty, the high court "plaee[d] decrees forever terminating parental rights in the category of cases in which the State may not `bolt the door to equal justice.' [Citation.]" (M.L.B. v. S.L.J., supra, 519 U.S. at p. 124, 117 S.Ct. at p. 568.)
The high court relied on two lines of cases: (1) those holding appellate review of criminal cases cannot be denied on the basis of poverty (see, e.g., Griffin v. People of the State of Illinois (1956) 351 U.S. 12 [76 S.Ct. 585], 100 L.Ed. 891; Mayer v. City of Chicago (1971) 404 U.S. 189, 92 S.Ct. 410, 30 L.Ed.2d 372); and (2) those recognizing that interest of parents in their relationship with their children is a fundamental liberty right protected by the Fourteenth Amendment (see Lassiter v. Department of Social Services (1981) 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640; Santosky v. Kramer (1982) 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599).
Because of the primacy of the parent-child relationship, the high court found the petitioner's interest at stakemaintaining a parental relationship with her childrenoutweighed Mississippi's justification for requiring the records feethe state's need for revenue to offset costsand deserved the same heightened protection afforded to criminal cases, where access to appellate review cannot be denied to indigents. (M.L.B. v. S.L.J., supra, 519 U.S. at pp. 119-124, 117 S.Ct. at pp. 565-568.)
M.L.B. v. S.L.J., supra, 117 S.Ct. 555, however, has little to do with this case and does not advance David's appeal.
We begin by noting this case is not about David's access to an appeal or to any other judicial process. It is about the state's decision to stop providing him reunification services, which points to another distinction: This case is not about an order terminating the parent-child relationship.[7]
*121 David's attempts to convince us otherwise are unavailing. David argues that without reunification services "he is denied the exclusive means by which he can reunify with Joshua" and "he will have no realistic way of convincing the court he is fit to regain custody of Joshua when the case is reviewed in six months." The law simply does not compel such dire consequences.
At the relevant time, subdivision (f) of section 361.5 read in pertinent part:
"If a court, pursuant to paragraph (2), (3), (4), (5), (6), (7), (8), (9), (10), (11), or (12)... does not order reunification services, it shall conduct a hearing pursuant to Section 366.25 or 366.26 within 120 days of the dispositional hearing. However, the court shall not schedule a hearing so long as the other parent is being provided reunification services pursuant to subdivision (a)." (Stats.1996, ch. 1083, § 2.5, p. 5873.)
So long as Tina is being provided reunification services, David will have the opportunity to address his drug and other problems affecting his parenting.[8] Moreover, the parent-child relationship is not necessarily terminated at the permanency planning hearing. (See § 366.26.)
Section 361.5, subdivision (b), does not treat indigents differently from non-indigents. It does not withhold government services on the basis of an invidious classification distinguishing the rich from the poor. Section 361.5, subdivision (b), is facially neutral; it creates no classification. Moreover, this statutory provision does not directly affect the fundamental right of maintaining the parental relationship, but rather concerns the provision of governmental services. Reunification services are a benefit, and there is no constitutional "entitlement" to these services. (In re Christina A., supra, 213 Cal.App.3d at pp. 1078-1079, 261 Cal.Rptr. 903.) In short, section 361.5, subdivision (b), which is neutral on its face and is designed to serve neutral ends, does not violate equal protection principles simply because David postulates a negative result down the line.
David was not denied reunification services because he is indigent; he was denied those governmental services because the court found, after a hearing and by clear and convincing evidence, that section 361.5, subdivisions (b)(10) and (12), applied by virtue of David's failure to reunite with his other son and his noncompliance with substance abuse programs. The legislative determination that reunification services should not be afforded in such circumstances had nothing to do with indigency.
Section 361.5, subdivision (b), also does not violate the constitutional guarantee of due process of law. The statute incorporates the constitutional standard of clear and convincing proof as required in parental termination proceedings by Santosky v. Kramer, supra, 455 U.S. at pages 768, 102 S.Ct. 1388 to 770. David was represented by counsel below, as he is on appeal; accordingly, the issues raised by Lassiter v. Department of Social Services, supra, 452 U.S. 18, 101 S.Ct. 2153, are not implicated. Finally, section 361.5, subdivision (b), can only be invoked after a hearing for which the probation officer must prepare a report. (§ 361.5, subd. (c).)

III. Visitation[*]

DISPOSITION
Affirmed.
KREMER, P.J., and HOWATT,[**] JJ., concur.
NOTES
[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.
[2] All statutory references are to the Welfare and Institutions Code.
[3] In February 1997, the Department took Gina into protective custody and filed a petition alleging she was in need of juvenile court protection because of Regina's drug use and general neglect and David's incarceration. In April, the court declared Gina a dependent and removed custody from Regina and David. David was granted supervised visits with Gina and ordered to participate in reunification services, which included drug testing, drug treatment and parenting classes.
[4] We need not relate the testimony as it pertained to Tina since she is not a party to this appeal.
[5] For a definition of retroactive, see In re Cindy B. (1987) 192 Cal.App.3d 771, 779, 237 Cal.Rptr. 677: "The retroactive application of a statute is one that affects rights, obligations or conditions that existed before the time of the statute's enactment, giving them an effect different from that which they had under the previously existing law. [Citations]." In other words, retroactive application of a recently enacted law applies "the new law of today to the conduct of yesterday." (Pitts v. Perluss (1962) 58 Cal.2d 824, 836, 27 Cal.Rptr. 19, 377 P.2d 83.)
[6] At the relevant time, section 361.5, subdivision (c) provided: "In deciding whether to order reunification in any case in which this section applies, the court shall hold a dispositional hearing. The probation officer shall prepare a report which discusses whether reunification services shall be provided.... [¶] The court shall not order reunification for a parent or guardian described in paragraph (3), (4), (6), (8), (9), (11), or (12) of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the minor.... [¶] The failure of the parent to respond to previous services, the fact that the minor was abused while the parent was under the influence of drugs or alcohol, a past history of violent behavior, or testimony by a competent professional that the parent's behavior is unlikely to be changed by services are among the factors indicating that reunification services are unlikely to be successful. The fact that a parent or guardian is no longer living with an individual who severely abused the minor may be considered in deciding that reunification services are likely to be successful, provided that the court shall consider any pattern of behavior on the part of the parent that has exposed the minor to repeated abuse." (Stats.1996. ch. 1083, § 2.5, pp. 5872-5873.)
[7] Another distinction is the legislation in M.L.B. v. S.L.J., supra, 117 S.Ct. 555, exacted a fee, while here the legislation denies a governmental service.
[8] We also note that the visitation order allowed David to contact Joshua by telephone or letter something David had done very little of in almost three years. Even without reunification services, David could re-establish contact with Joshua and presumably if this went well it could lead to visitation, which in turn could open other potential avenues to reunification.
[*] See footnote*, ante.
[**] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.