Filed 3/6/23  M.R. v. Super. Ct. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| M.R.,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>    Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | F085390<br><br>(Super. Ct. No. 22CEJ300055-1)<br><br><br>**OPINION** |

---

### THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Kimberly J. Nystrom-Geist, Judge.

Moran Law Firm and Amanda K. Moran for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Ashley Nicole McGuire, Deputy County Counsel, for Real Party in Interest.

---

[*]     Before Levy, Acting P. J., Detjen, J. and Meehan, J.

-ooOoo-

Following a contested jurisdiction/disposition hearing on December 6, 2022, the juvenile court adjudged then one-year-old A.A. a dependent child under Welfare and Institutions Code section 300, subdivisions (a) (severe physical harm), (b)(1) (failure to protect), (e) (severe physical abuse) and (i) (cruelty)[1] because of severe physical abuse he sustained in the care of his parents, petitioner M.R. (mother) and his father Andre A. (father). The juvenile court denied the parents reunification services on multiple grounds, including section 361.5, subdivision (b)(5), and set a section 366.26 hearing on March 29, 2023. Mother contends insufficient evidence supports the juvenile court's denial of services orders and seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) staying the section 366.26 hearing and directing the juvenile court to provide her reunification services.[2] We find no error and deny the writ petition and request for a stay.

**FACTUAL AND PROCEDURAL SUMMARY**

A.    *The Referral*

On February 18, 2022, mother took then three-month-old A.A. to the emergency room because he was crying and vomiting. A brain scan revealed bilateral subdural fluid collections. A bone survey revealed an acute transverse fracture of the mid left humeral diaphysis, acute metaphyseal corner fractures of the left distal tibia and fibula, a healing subacute metaphyseal corner fracture of the right distal tibia, healing left lateral sixth and seventh rib fractures with callous formation, even older more healed fractures of the left lateral second rib and left lateral eighth rib and a possible nondisplaced acute right lateral seventh rib fracture. The rib fractures were estimated to be about two weeks old. A.A. also had slight bruising on his chest and his liver enzymes were elevated, consistent with A.A. having experienced some kind of trauma. He also had moderate intraretinal

---

[1]    Statutory references are to the Welfare and Institutions Code.

[2]    Father did not file a writ petition.

hemorrhaging consistent with repetitive head motion trauma, also known as shaken baby syndrome. Neither parent had an explanation for A.A.'s injuries. A.A. was admitted to the hospital and underwent neurosurgery to drain the fluid on his brain.

Dr. Jessica Daly, the child advocacy attending physician, opined A.A.'s injuries were not consistent with a medical explanation and were very likely the result of nonaccidental trauma.

G.R., the maternal grandmother, contacted the hospital staff and reported that A.A. had marks on his body in the past and that father had been behaving strangely recently. A.A. began daycare on February 15, 2022. Two days later, G.R. noticed bruising on his chest. When she confronted mother about the bruising, mother denied knowing about it. Father stated the doctors checked him and did not find anything. A.A. was also evaluated at the hospital on December 27, 2021, for marks on his arms and legs, which was diagnosed as a rash. On December 29, 2021, he was taken to the hospital and diagnosed with respiratory syncytial virus (RSV). G.R. did not believe A.A. had a rash because the marks looked like bruising. G.R. is a surgical assistant and could tell it was not a rash. She noticed bruising on A.A. early in his life and told mother to take him to the hospital. She asked father what happened, and he would not make eye contact with her and appeared angry. He hit his hands on the car and shook it. She said father smoked marijuana and drank alcohol frequently and was not allowed in her house if he was under the influence.

Mother said she had no known medical conditions that would account for A.A.'s injuries. He had markings on his body on December 27, 2021, which was determined to be a rash from RSV. He was diagnosed with RSV two days later. She said the rash looked like purple and red dots, which the doctor attributed to him being sick and to a lotion she was putting on him. When she stopped applying the lotion, the rash disappeared. She took A.A. to the doctor on February 16, 2022, because he had a temperature of 103 degrees. The parents were instructed to administer a suppository

3.

laxative for constipation and probiotics.  Mother gave A.A. a different medication and his condition did not improve.  The following day, they were at G.R.'s house and she helped father administer the suppository which appeared to provide A.A. relief.  A.A. was no longer fussy but was spitting up.  G.R. noticed that A.A. had bruising on his chest when changing him.  The bruise was yellow and ran under his left nipple.  Mother did not know what caused the bruising.

Mother could not remember any incident which could have caused A.A.'s injuries.  She denied harming him and did not suspect anyone of harming him.  She was always with him unless she was at work.  She resumed work on February 15, 2022, and A.A. was placed in an in-home daycare with a woman who also provided daycare for mother's nephew.  She left A.A. with G.R. overnight on three to four occasions.  After mother returned to work, father cared for A.A. until mother returned from work on those days when A.A. was not in daycare.

Mother reported she and father were married in August 2021.  They had a healthy relationship and there was no domestic violence.  They argued but it was never physical, and they did not shout at each other.  A.A. was a good child and never cried until he became sick with RSV.  Father loved A.A. and did not appear to get frustrated with him.  Mother denied any substance abuse, mental health problems or criminal history.

Father reported mother was A.A.'s primary caregiver and A.A. went to daycare on Tuesday, Wednesday and Thursday.  He did not know how A.A. was injured and did not witness anyone harm him.  A.A. did not fall and was not harmed by the family dogs.  Mother did not have postpartum depression and was not overwhelmed by A.A.  Father denied having any mental health problems or using any controlled substances or alcohol.  The last time he used marijuana was when he was a teenager.  He and mother did not engage in domestic violence.  He worked full time Monday through Friday and sometimes on the weekend.

On February 20, 2022, the department served a protective warrant and detained A.A. at the hospital. The following day, a social worker and police officer met with father. He said he believed the family dog knocked A.A. out of his swing. He was home alone with A.A. and mother was at work. A.A. was not properly restrained in the swing and the dogs were running around the house. One of the dogs knocked the swing as it ran by. Father did not witness the swing fall but heard a loud thud and saw A.A. lying face down on his left arm and crying. He then saw the dog run past A.A. He picked A.A. up to console him and put the dogs away. He did not tell mother because he was afraid she would make him get rid of the dog. A.A. did not cry throughout the day so he thought he was okay. He did not think to share the incident about the swing when he was questioned by the social worker and the police and apologized for lying about smoking marijuana and drinking alcohol. He said he drank alcohol on occasion and smoked marijuana but not daily. He denied being under the influence while caring for A.A. and when A.A. fell from the swing. He then stated he wondered if A.A. was injured because he swaddled him too tightly or if the nurses were too rough with him.

Social worker Gayane Petrosyan notified the parents about a team decision making meeting (TDM) scheduled for February 23, 2022. Mother asked for advice on how she should handle herself and how she could " 'back herself up' " and how she could back father up since she was not at home when A.A. fell. Petrosyan encouraged them to be honest. She visited the family home and found it clean with no safety hazards. She observed A.A.'s swing and estimated it was approximately a foot and a half above the ground when fully operating.

On February 22, 2022, Dr. Daly stated that she ordered extra X-rays of A.A. because the original bone scan did not include his hands or feet. The new X-rays revealed a fracture of the left foot between the fourth and fifth metatarsals. Dr. Daly also noticed a subtle bruise on A.A.'s left hip that had not been documented by the other doctors. The accumulation of fluid and blood in A.A.'s head was indicative of chronic

5.

trauma and was so significant that it caused his head to appear larger than normal. Mother claimed A.A.'s head had always been large and showed Dr. Daly a picture taken some time before. Dr. Daly perceived A.A.'s head as looking normal in the picture. Because of the fluid accumulation in A.A.'s brain, his brain matter was only approximately 60 percent of what it should be and could portend possible developmental delay. A.A.'s brain was able to expand within his skull because his fontanelles were not fused. Had they been fused; he could have died from the brain swelling. Even though A.A. did not die, he could have.

Neither parent presented any new information or explanation for A.A.'s injuries at the TDM on February 23, 2022. However, later that day father asked to speak to Petrosyan and a detective. He said he may be the reason A.A. sustained rib fractures and wanted to "get it off [of] his chest." He admitted getting frustrated with A.A., grabbing him by both sides of his ribs and shaking him. It happened two or three times while changing A.A. Father grabbed him by the ankles too hard and pulled him aggressively toward him. He did not always change A.A.'s diaper in this aggressive manner but did approximately 10 times. When he did, it startled A.A. and he cried. When A.A. cried, father put him on his chest to comfort him and put pressure on his ribs by squeezing too hard. If A.A. did not stop crying, he shook him. He denied shaking him back and forth, causing his head to wobble. Instead, he demonstrated using a doll how he held A.A. upright around the rib area and shook him by placing pressure on his ribs as if the baby was vibrating all over. He did admit rocking A.A.'s car seat aggressively and in a fast manner while in the car if A.A. cried. He rocked the car seat to the point that A.A.'s head flopped back and forth and from side to side. He did not know how A.A. sustained the bruising and never noticed his head looked different. He was last aggressive with A.A. during the week of February 14, 2022. He was alone with A.A. on Tuesday and Wednesday. He shook A.A. the way he demonstrated.

B.     *The Initial Proceedings*

On February 23, 2022, the department filed a first amended dependency petition, alleging A.A. came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), (e) (severe physical abuse) and (i) (cruelty) based on the nonaccidental nature of the injuries he sustained, which it detailed, while in the care of his parents.

The juvenile court made temporary orders removing A.A. from his parents at the initial detention hearing on February 24, 2022, and continued the hearing to February 28, 2022. On February 28, the court ordered A.A. detained, offered the parents random drug testing, ordered reasonable supervised visitation and set the jurisdiction and disposition hearing for April 6, 2022. The department placed A.A. with his maternal grandparents.

The jurisdiction and disposition hearing was continued to April 13, 2022. In its report for the hearing prepared in April 2022, the department recommended the juvenile court sustain the allegations and deny the parents reunification services under section 361.5, subdivision (b)(5) and (6). Mother observed father shake A.A. in his car seat but denied that he did it aggressively. She removed A.A. from him if she saw he was mad, frustrated or aggressive with A.A. She and father were still married but no longer living together. They spoke over the phone about A.A. and visited him together.

On April 13, 2022, the juvenile court set the matter as a contested hearing, which was continued and conducted as a contested hearing on December 6, 2022. Meanwhile, the department filed an addendum report, reiterating its recommendation to deny services and informing the juvenile court the parents completed classes in parenting and anger management. They enrolled in random drug testing in March 2022. Father tested positive twice for THC and mother for creatinine.

C.      *The Jurisdiction and Disposition Hearing: December 6, 2022*

Social worker Ashley Holmes testified she interviewed G.R. about her time spent with A.A. but did not investigate any other people who mother identified as having contact with A.A. She did not speak with A.A.'s pediatrician. Mother asked her what

services she recommended and Holmes recommended parenting, domestic violence, mental health, substance abuse and testing. The parenting class was free but the others required payment and some like the child abuse class required a referral from the department. Mother attempted to enroll in a child abuse class but was unable because she did not have a referral. Holmes believed the department was paying for mother to participate in random drug testing. Sometime around May 2022, mother told her she was living with her maternal grandmother. However, the department was concerned she and father had ongoing contact. The department received several reports they were living together, and they were seen together in public. Holmes did not take any steps to determine whether they were living together. In addition, they arrived together for visits and visited A.A. together.

Mother testified she was home taking care of A.A. from his birth in November 2021 until she returned to work on February 15, 2022. Father returned to work in December 2021. Her mother (G.R.) and sister came to their home after father returned to work. Starting in December 2021, she allowed A.A. to stay overnight with G.R. Her father, 22-year-old sister, 20- to 21-year-old brother-in-law, 16-year-old brother, and one-year-old nephew also lived in the home. She continued to allow G.R. to care for A.A. overnight in January 2022. She took A.A. to the hospital on February 18, 2022, because he was not drinking his milk and was spitting it up. A week later, father told her that A.A. fell out of his swing on February 16, 2022. Mother did not observe any bruises on A.A. on that day. Asked whether she had any reason to believe that father caused A.A.'s injuries, she stated, "They did tell me that there was evidence to support his injuries." She had never personally observed father injure A.A. and she did not know how he was injured.

Mother completed a 12-week parenting class and 12 weeks of anger management and continued to attend anger management classes. She paid for the classes as well as the drug testing. She also attended two sessions of individual mental health therapy. She

attempted to enroll in a child neglect and domestic violence class but did not have the required referrals. Mother moved in with her grandparents in early May 2022 and was committed to remaining separate from father.

On cross-examination, mother denied ever witnessing father exhibit any behavior while caring for A.A., including frustration, that concerned her or ever taking A.A. from him because he was frustrated with A.A. Despite knowing that father explained ways in which he may have harmed A.A., mother still denied knowing how A.A. received his injuries.

During argument, mother's attorney argued mother did not injure A.A. or know that he had been injured and asked the juvenile court to dismiss the section 300, subdivisions (e) and (i) counts and provide her reunification services. She also pointed out that mother separated from father and engaged in services on her own. Father's attorney objected to the department's recommendations and asked the court to provide him reunification services.

## D. *The Juvenile Court's Ruling*

The juvenile court found true the allegations in the dependency petition and adjudged A.A. a child described under section 300, subdivisions (a), (b)(1), (e) and (i). The court also ordered A.A. removed from parental custody, denied the parents reunification services under section 361.5, subdivision (b)(5) and (6), found visitation would be detrimental, and set a section 366.26 hearing.

In ruling, the juvenile court enumerated A.A.'s many injuries, noting they were "consistent with ongoing physical abuse," and were "in various stages of healing, each of which would be painful to the child." The court also noted that A.A. had persistent developmental delays. "Any reference to [daycare was] simply a red herring on the parents' part in an attempt to draw attention away from the reality that the parents were the ones who had the exclusive care of [A.A.]." The court found that father admitted causing the injuries yet mother maintained she did not know "of anyone who would have

9.

harmed her child." The court found her testimony "completely unbelievable on every issue that was relevant to jurisdiction." The court stated, "I did not believe that the mother had no knowledge of how [A.A.'s] injuries were sustained. I did not believe that the mother had any belief that [A.A.] fell from a swing. That appeared by her entire demeanor to be completely fabricated."

Regarding the denial of reunification services, the juvenile court noted that while father was perhaps the more likely perpetrator of A.A.'s injuries, "there is no evidence that exonerates the mother." Rather, "[t]here is evidence that she must have known that [A.A.] … was having his bones broken over a period of time, that his brain was bleeding" and took no action to protect him even if she had no part in it. The court continued, "[Mother] was aware that [father] was frustrated and she had to take [A.A.] from [him]. The parents do not have credibility. It is unclear whether they are or are not continuing a relationship. … Whether that is permanent, temporary or true, the [c]ourt cannot know." The court also found there was no evidence that A.A. was closely and positively attached to his parents.

### DISCUSSION

Mother contends the juvenile court erred in denying her reunification services under section 361.5, subdivision (b)(5) and (6) because there was insufficient evidence to support a finding A.A. suffered severe physical abuse under section 300, subdivision (e) either because she inflicted it upon him or knew or reasonably should have known that father did. Specifically, she argues she was not present when A.A. was harmed, she never witnessed father injure A.A., she did not harm A.A., and there was no evidence she concealed the physical abuse or observed any behavior by father that indicated he was physically abusing A.A.

Where, as here, the juvenile court finds multiple statutory grounds for denying reunification services, we need only conclude substantial evidence supports one of them in order to affirm the juvenile court's denial of services order. (See *In re Jonathan B.*

10.

(1992) 5 Cal.App.4th 873, 875−876 [where one basis is supported by substantial evidence the court does not need to consider the sufficiency of evidence to support other bases].) We conclude substantial evidence supports a denial of services under section 361.5, subdivision (b)(5) and affirm.

*A.      Relevant Legal Principles and Standard of Review*

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the child and the child's mother and statutorily presumed father." (§ 361.5, subd. (a).) However, it is also the "intent of the Legislature, especially with regard to young children, … that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (*Ibid.*) Specifically, section 361.5, subdivision (b), exempts from reunification services " 'those parents who are unlikely to benefit' " from such services or for whom reunification efforts are likely to be " 'fruitless.' " (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 470, 474.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) In this case, the juvenile court denied mother reunification services under section 361.5, subdivision (b)(5) and (6).

1.  Section 361.5, subdivision (b)(5)

Section 361.5, subdivision (b)(5) allows for the denial of reunification services when the court finds, by clear and convincing evidence, that the child was brought within the jurisdiction of the court under section 300, subdivision (e) because of the conduct of that parent. Subdivision (e) of section 300 describes a child who was under five years of age and suffered severe physical abuse by a parent, or by any person known by the

11.

parent, if the parent knew or reasonably should have known that the person was physically abusing the child. "[S]evere physical abuse" is defined in the statute, as relevant here, as "any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death" or "more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness." (§ 300, subd. (e).)

Whenever section 361.5, subdivision (b)(5) applies, the juvenile court must bypass reunification services "unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent. The social worker shall investigate the circumstances leading to the removal of the child and advise the court whether there are circumstances that indicate that reunification is likely to be successful or unsuccessful and whether failure to order reunification is likely to be detrimental to the child." (§ 361.5, subd. (c)(3).)

"The failure of the parent to respond to previous services, the fact that the child was abused while the parent was under the influence of drugs or alcohol, a past history of violent behavior, or testimony by a competent professional that the parent's behavior is unlikely to be changed by services are among the factors indicating that reunification services are unlikely to be successful. The fact that a parent … is no longer living with an individual who severely abused the child may be considered in deciding that reunification services are likely to be successful, provided that the court shall consider any pattern of behavior on the part of the parent that has exposed the child to repeated abuse." (§ 361.5, subd. (c)(4).)

2. Section 361.5, subdivision (b)(6)(A)

Section 361.5, subdivision (b)(6)(A) of section 361.5 allows the denial of reunification services where the juvenile court finds by clear and convincing evidence

12.

that the child was adjudicated a dependent pursuant to any subdivision of section 300 as a result of severe physical harm to the child caused by a parent and the court makes a factual finding that it would not benefit the child to pursue reunification services with the parent. "[S]evere physical harm" under the statute, as relevant here, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body by an act or omission of the parent. (§ 361.5, subd. (b)(6)(C).)

### 3. Standard of Review

We review the true findings on the statutory bases for jurisdiction for substantial evidence. (*In re K.S.* (2016) 244 Cal.App.4th 327, 337.) We also review an order denying reunification services under subdivision (b) of section 361.5 for substantial evidence, however, bearing in mind the juvenile court was required to apply the heightened clear and convincing evidence standard of proof. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995−996.)

Mother argues we must employ the de novo standard in reviewing the juvenile court's decision to deny her reunification services because the facts are undisputed and the issue concerns the application of the bypass provisions. We disagree the facts are undisputed. The juvenile court found that mother knew father was physically abusing A.A. and failed to protect him. The crux of mother's argument on appeal is that she did *not* know that was occurring. Consequently, substantial evidence is the proper review standard in this case. Thus, we apply it.

B. *Substantial Evidence Supports the Juvenile Court's Order Denying Mother Reunification Services Under Section 361.5, subdivision (b)(5)*

It is undisputed that A.A. was under the age of five years and suffered severe physical abuse while in the care of his parents. He had multiple fractures of his legs and ribs in various stages of healing, fluid and blood on his brain and intraretinal bleeding. All signs pointed to deliberate infliction of physical harm, which father ultimately

13.

admitted perpetrating.  At trial, mother attempted to prove, as she does in this writ petition, that she had no knowledge father was physically abusing A.A. and therefore cannot be held accountable.  The juvenile court, however, found that the evidence did not exonerate her.  Rather, the court found that A.A.'s injuries would have been painful and that mother was sufficiently concerned about father's handling of A.A. that she took him from father.  On that evidence, the court could find A.A. was a child described under section 300, subdivision (e) because of mother's conduct by clear and convincing evidence.

Further, there was no evidence that providing mother reunification services was likely to prevent reabuse.  Although she did not have the kind of history that weighed against providing her services (i.e., failure to respond to previous services, history of violence, being under the influence of drugs or alcohol when A.A. was injured), her unwillingness to acknowledge that father severely physically abused A.A. rendered it unlikely that providing her reunification services would prevent A.A. from being abused in the future.  As the juvenile court noted, "The parents have not even been able to settle on an explanation, despite working together to do so, as evidenced by the mother consulting with the father … and failing to acknowledge the father's explanation of how the baby's bones could have been broken."  Further, the court found mother lacked credibility.  Although she testified that she and father no longer lived together, it was unclear whether they continued their relationship and whether the separation was temporary or permanent.  Consequently, the court had no reason to believe mother could protect A.A. from father.  Finally, the court found A.A. was not closely and positively attached to mother.  Therefore, it would not be detrimental to him not to offer mother reunification services.

### C.  Best Interest

Citing section 361.5, subdivision (c)(2), mother contends the juvenile court erred in not finding that reunification served A.A.'s best interest.  Subdivision (c)(2) provides that the "court shall not order reunification for a parent … described in paragraph (3), (4),

[and] [(6) through (17)] of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." Notably, the statute does not include paragraph (5) (i.e., subdivision (b)(5)) and therefore it does not apply. Instead, where subdivision (b)(5) applies, the court may only order reunification services if it finds that services are likely to prevent reabuse. Here, the court did not order reunification services and therefore did not have to determine whether services would prevent reabuse. Nevertheless, the court made the finding, and we conclude substantial evidence supports it.

We find no error.

## DISPOSITION

The petition for an extraordinary writ and request for a stay are denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).