Filed 1/13/22  In re J.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D079288 |
| Plaintiff and Respondent, | (Super. Ct. No. J520666) |
| v. | |
| G.P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

At the contested disposition hearing in dependency proceedings under Welfare and Institutions Code[1] section 300, subdivision (b)(1), the juvenile court allowed a no-contact order issued at a prior hearing to remain in effect between G.P. (Mother) and her seventeen-year-old adopted son, J.P., finding that contact between Mother and J.P. would be detrimental to the minor. In this appeal, Mother contends the juvenile court erred by refusing to lift the no-contact order. She also challenges the lack of testimony from J.P. at the disposition hearing. Finding no error, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Initiation of Dependency Proceedings and Detention*

J.P. was born in 2004. He was placed in Mother's care several weeks after his birth due to his biological mother's drug use. His adoption was finalized in 2006, and Mother is his only adoptive parent. Mother also has two adopted daughters, who were eleven and twelve years old at the outset of this case.

On September 14, 2020, J.P. was hospitalized under section 5150 for posing a danger to others. On the previous day, Mother locked J.P. out of the home and called the police to report that J.P. had hit her and had also broken her fingers in the past. J.P. denied ever hitting Mother. Assault charges were brought against J.P. in juvenile court stemming from this incident, but the charges were not pursued.

After the San Diego County Health and Human Services Agency (Agency) was notified of J.P.'s hospitalization, J.P. reported that Mother "constantly" told him to kill himself. He also disclosed that Mother would pull his underwear down and pull his genitals. He indicated that this

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

behavior seemed to be in jest rather than sexual. Mother and J.P.'s sisters denied this behavior had occurred.

Doctors determined during J.P.'s hospitalization that he did not meet the criteria for a section 5150 hold, but Mother refused to pick him up once he was ready for discharge. She claimed she did not feel safe with J.P. in the home, and that he was going to kill her. She also suggested that he was a drug dealer with connections to the cartel. J.P. was ultimately discharged and returned home. Several days later, one of J.P.'s sisters called the police after J.P. and Mother had another argument that became physical.

The Agency offered a child and family team (CFT) meeting to provide the family with resources and additional support. Mother refused the meeting, claiming the family's situation had stabilized. At that point, the Agency had also determined that J.P.'s allegations of sexual abuse were unfounded, and the referral was closed.

On January 30, 2021, J.P. was arrested for engaging in a physical altercation with Mother and for damaging doors in the home. J.P. had broken a door frame trying to get back into the home after Mother locked him in the garage, and a physical fight ensued. The following morning, Mother turned off the Wi-Fi connection while J.P. was doing his homework. J.P. became angry and started breaking things, resulting in Mother calling the police.

J.P. was charged with two counts of misdemeanor battery and one count of felony vandalism following this dispute. He was taken to an emergency shelter where he stayed for 21 days. Mother was upset J.P. was not taken to juvenile hall, and she initially refused to consent to treatment for J.P. at the shelter but later agreed to services. J.P. was aware that

Mother wanted him in juvenile hall, and believed that Mother preferred that he stay at a homeless shelter for a month rather than be at home with her.

While J.P. was at the shelter, the "primary concern" was that J.P. would have no place to live after his 21-day stay. J.P. reported that he did not feel comfortable or safe at home. He stated that he and Mother argued daily. He claimed that during their most recent dispute, Mother pushed and hit him first, and he pushed back. He also claimed that the dispute made him cry. He complained that he had no privacy at home, because Mother removed the doorknob to his room and took his cell phone. He also stated that Mother refused to help him with his schoolwork. He claimed Mother verbally abused him and yelled at him, telling him "You're not my son," and that he is fat and ugly. He also disclosed that he suffers from depression, and that he self-medicates with marijuana because anti-depressants made him feel worse. There were also reports that Mother had locked J.P. out of the home and forced him to sleep outside.

Staff at the shelter also indicated that Mother appeared overwhelmed, was inconsistent, and had trouble following through. Mother had stated that she did not want J.P. to return home. According to her, J.P. was a threat to his younger siblings, smoked marijuana daily, and associated with gang members. However, Mother ultimately agreed to let J.P. return home, and he was discharged from the shelter on February 20, 2021.

Shortly after J.P.'s discharge from the shelter, police were called to the home again based on reports that J.P. was being physically aggressive and had broken Mother's fingernail. J.P. claimed that this dispute stemmed from a list he made at the shelter of all the items he wanted Mother to bring him from home. Mother never brought him these items, and J.P. discovered when

he returned home that Mother had thrown the items away. J.P. denied hitting Mother during this incident.

After police were called, J.P. was arrested and transported to an emergency screening unit (ESU). J.P. made homicidal statements during his initial assessment at the ESU, claiming he wanted to kill Mother. He also stated he was going to kill himself and that he would not reach 18 years old. According to the ESU, J.P. had been diagnosed with disrupted mood dysregulation disorder (DMDD) in March 2019, and a doctor at the ESU confirmed this diagnosis. J.P. had also been previously diagnosed with attention deficit hyperactivity disorder and current moderate episode depressive disorder without prior episode. ESU staff reassessed J.P.'s condition over the following days, at which point J.P. was no longer endorsing any suicidal or homicidal ideations. There were also no signs that he was experiencing audio or visual hallucinations.

The ESU determined J.P. was ready for discharge on February 22, 2021. However, according to the Agency's detention report, Mother refused to pick up J.P. or provide any plan for his living arrangements. Mother indicated that she did not feel safe with J.P. in the home and also refused to authorize J.P. to return to the emergency shelter. Instead, she wanted him locked down in a facility and monitored. She insisted that J.P. should be admitted for psychiatric services at a children's hospital, although ESU staff had determined that J.P. did not meet the criteria for placement in a psychiatric facility. Mother then retained an attorney and refused to speak with the ESU staff directly. Due to Mother's lack of cooperation, J.P. was taken into custody by the Agency and placed in a group home.

On February 24, 2021, the Agency filed a juvenile dependency petition on J.P.'s behalf under section 300, subdivision (b)(1). The Agency alleged J.P.

required the protection of the juvenile court due to Mother's failure to provide a home for J.P. and refusal to authorize any temporary housing arrangements once he was ready for discharge from the ESU.

At the detention hearing on February 25, 2021, the juvenile court appointed counsel for Mother and J.P., detained J.P. at the group home, and ordered the Agency to provide Mother with voluntary services. The court further ordered "liberal" supervised visitation between Mother and J.P., including visitation between J.P. and his nondependent siblings consistent with the rules of his group home.

Pending the jurisdiction and disposition hearing, the social worker interviewed J.P. regarding his relationship with Mother. He reported that although Mother provided him with food, she did not support his mental health. She told him to kill himself "almost every day," and he reported feeling suicidal. He indicated that Mother started a fight with him during a recent call while he was at the group home and made him cry. He also disclosed that he had a history of self-injurious behavior. Although he no longer felt suicidal, he reported that he still felt depressed. He admitted that he self-medicated his depression with marijuana but denied using other drugs. When asked about sexual abuse, J.P. continued to allege that Mother would "pull [his] pants down, and grab [him] down there."

J.P. indicated that his relationship with his sisters was strained because of Mother. He believed Mother "manipulate[d] them" and that they were her "little minions." He also said Mother would scream at his sisters and call them "dumb." Additionally, he accused Mother of throwing things at him, including throwing a hammer at his head, and punching him once. She also locked him out of the house on several occasions, forcing him to sleep outside. He complained that Mother takes his possessions and would either

6

sell them or throw them away, including things he had paid for. She also interfered with his personal relationships by falsely claiming that J.P. "went to juvie, [and] did a lot of illegal things." He indicated that he did not want to attend a CFT meeting if Mother was present and expressed doubts that the family would be able to reunify.

During the social worker's interview with Mother, she denied that she was ever notified that J.P. needed to be picked up from ESU. She also continued to accuse J.P. of using and selling drugs and having gang connections. To substantiate her claim that J.P. was involved with gangs, Mother indicated that she had seen pictures of his friends with guns. When the social worker asked how he could find those pictures, Mother replied, "Isn't that your job to find them?" Mother also claimed that J.P. had told her that he overdosed once before. She also claimed that she found marijuana, a pipe, and burnt spoons in his room. She believed J.P. needed counseling to help him with drugs, gangs, mental health, and school, and that he also needed a medical evaluation because he occasionally transitioned rapidly from anger to crying. However, she refused a psychological evaluation for herself. She also indicated that she and her daughters had started going to counseling but refused to tell the social worker where they were receiving counseling.

In the Agency's jurisdiction report, the Agency recommended that J.P. remain at his current group home, where he was doing well according to the staff. Regarding visitation, J.P. had called Mother a few times from the group home, with no response. They also had a phone conversation on March 15, 2021 that went "negatively." Notwithstanding these issues, the Agency recommended reunification services and liberal supervised visitation for Mother.

B.      *The Juvenile Court's Issuance of a No-Contact Order*

At a pretrial jurisdiction and disposition hearing on March 22, 2021, Mother's counsel requested the juvenile court set the matter for trial on the jurisdictional and dispositional issues and listed her possible witnesses, which included J.P.  Mother's counsel further requested to keep the current visitation order in place.

J.P.'s counsel objected to visitation between Mother and J.P. and requested a no-contact order.  J.P.'s counsel stated that J.P. did not want any visitation, and that he felt "very upset regarding the whole situation."  For example, Mother had failed to bring J.P. the few personal belongings from home that he had requested.  Additionally, J.P.'s situation had improved once he was removed from Mother's care, as his current placement was "extremely structured" and was providing him with "a lot of services."  Counsel suggested that "maybe right now just isn't the best time for [Mother] or [J.P.] to be having contact until things can neutralize because it is a very hot situation right now."  Counsel also indicated that if a no-contact order was put in place, the issue could be revisited at a later hearing.

Mother's counsel objected to the no-contact order, contending there was not a sufficient basis for the juvenile court to find that contact between J.P. and Mother would be detrimental.  As for the Agency, it continued to request supervised visitation for Mother, but indicated that it would not object to a no-contact order if the court was inclined to make a detriment finding.

After hearing arguments from the parties, the juvenile court issued a no-contact order, stating:  "The Court is going to defer to guardian ad litem, [J.P.'s counsel], also 16-year-old-plus [J.P.], and we'll order that there will be no visitation.  However, the Court will authorize the social worker to recommend a change in the no-visitation order, ex parte, with notice to

8

counsel, if that is appropriate or becomes appropriate before the next court hearing date. Otherwise, we can visit the issue at the next court hearing date which would be the pretrial status conference." The court further indicated that Mother should work with the Agency to retrieve the items J.P. had requested from home.

C.    *Events Following the Initial No-Contact Order*

There was no contact between Mother and J.P. after the juvenile court issued the no-contact order. However, Mother was still failing to provide J.P. with his requested belongings. She also continued to claim that J.P. had used drugs other than just marijuana, "including nicotine and vaping." She expressed concerns that the Agency was considering a home-based placement because she believed he needed to be in a "facility." The social worker informed Mother of the Agency's responsibility to place minors in the least-restrictive environment that can meet their needs, which concerned Mother.

As for J.P., he indicated that he thought about calling Mother about his personal belongings but otherwise did not want any contact with her. He noted that he preferred the group home to living with Mother even though he disliked the structure and rules at the group home. According to J.P.'s therapist, J.P. was having successful visits and day passes with non-relatives. Staff at the group home also confirmed that J.P. was participating in all therapies and activities, and there were no new concerns regarding J.P.'s behavior or well-being.

The juvenile court held a meet and confer hearing on May 5, 2021 regarding whether J.P. should become a juvenile justice ward under section

9

602,[2] a dependent child, or a dual status youth. Both Mother and J.P. were present at the hearing by videoconference. The Agency and Probation agreed the best course of action would be to dismiss the section 602 petition and continue with the dependency proceedings. However, since J.P. had not yet been declared a dependent child, the Agency asked to continue the matter until after the upcoming jurisdictional trial in the dependency case.

Mother's counsel emphasized at the meet and confer hearing that Mother was not in agreement with dismissing the 602 petition, and that Mother favored pursuing criminal charges against J.P. Mother then personally addressed the juvenile court with her concerns about J.P.'s behavior. Although she recognized he was receiving "some kind of therapy" at the group home, Mother believed these services were inadequate to address J.P.'s needs. She stated that J.P. had been "escalating in violence" for several years, had assaulted her, broken things, and that he did so intentionally and without remorse. She referenced his diagnosis of DMDD and further suggested that he had "socialization issues" and abused drugs. She believed his drug problems had been "whitewashed" since it was her impression that he was only receiving treatment for marijuana use. She also believed J.P. was involved in "gang violence," which was also not being addressed. The court intervened several times to remind Mother that the goal of these proceedings was to identify ways to get J.P. the help that he needed. The court then continued the matter pending a determination on the jurisdictional issues in the dependency proceedings.

---

[2] Section 602 provides, in relevant part: "[A]ny minor who . . . violates any law of this state . . . is within the jurisdiction of the juvenile court, which may adjudge the minor to be a ward of the court."

At the pretrial settlement conference for the dependency proceedings the following day, the parties were unable to reach an agreement on jurisdiction and disposition. J.P.'s counsel noted that J.P. had still not received his requested belongings, and asked the juvenile court to order Mother to work with the Agency to ensure J.P. receive the requested items. Mother's counsel submitted on this request and confirmed the matter for trial.

Mother's counsel indicated that Mother was intending to challenge the truth of the allegations for jurisdiction, as well as contest visitation and J.P.'s level of placement at disposition. Mother's counsel further noted that Mother was not requesting placement of J.P. in her home. At the close of the hearing, the juvenile court confirmed the trial date and ordered Mother to return J.P.'s personal belongings. Pursuant to the juvenile court's order, Mother provided J.P. with one of the items but claimed she did not know the whereabouts of his other requested belongings.

At the contested hearing on June 4, 2021, J.P.'s counsel requested a continuance of the disposition portion of the trial, with the hope that J.P. would be ready to transition from his group home into a lower level of care by the time of the contested disposition date. Mother's counsel responded that, if the court was inclined to continue disposition, the court should also continue the jurisdiction portion of the trial because J.P.'s level of placement was relevant to a true finding under section 300. Mother's counsel explained that she was asking the juvenile court to make a true finding and to take jurisdiction under section 300, subdivision (c), rather than on the existing petition allegations, which were pled under section 300, subdivision (b)(1). Further, Mother was requesting to have J.P. on "stand-by" to testify in case his testimony was relevant on the jurisdictional issues. J.P.'s counsel

11

opposed calling J.P. to testify, explaining that the dual hearing had been a "very, very bad experience for [J.P.] based on what came out of the mother's mouth [at the hearing]," and that forcing him to testify in this matter could further traumatize him.

The juvenile court ruled that it was in J.P.'s best interests to continue the disposition hearing. However, the court declined to continue the jurisdiction portion of the trial and ruled that J.P. would not be compelled to testify. The court found that J.P.'s testimony was not relevant or material to the allegations in the petition, and that forcing him to testify could be damaging to his mental health. The court was particularly troubled by Mother's behavior over the course of the proceedings, explaining, "Every opportunity she gets, [J.P.'s] mother is saying nasty things about him. So we're moving in the wrong direction. And I am not inclined to subject him to that. Given the allegations as proved, I don't think that what he has to say is material to those allegations."

The parties then proceeded on the jurisdictional issues. The juvenile court admitted into evidence a letter from Mother's therapist, indicating that she had completed ten therapy sessions for treatment of "F43.9 Reaction to severe stress." The letter noted that Mother had made improvements in sleep, anxiety management, and self-advocacy, and had joined an online support group for parents of children with DMDD. The court also admitted the Agency's reports; a letter from J.P.'s therapist; a letter from J.P.'s primary care physician; a needs and services plan regarding J.P.'s needs and treatment goals; a report dated March 15, 2021 from the group home describing an incident when staff discovered J.P. engaging in drug-seeking behavior; and five police reports documenting J.P.'s contact with law enforcement between September 2020 and February 2021.

During the jurisdictional hearing, the social worker who began working with the family in September 2020 was called to testify. She indicated that following an initial period of good communication, Mother stopped responding to her communications in November 2020, and the referral was subsequently closed in December 2020. The social worker further testified that Mother refused to pick up J.P. after he was ready for discharge from the ESU on February 20, 2021. Although the Agency and J.P.'s prior shelter had provided Mother with referrals for temporary placements, Mother was insisting that J.P. be placed at an inpatient psychiatric unit. Mother told the social worker she did not want J.P. to return to the shelter because she believed J.P. had relapsed on drugs while he was at the shelter, even though the shelter did not report any drug use by J.P. and indicated that he had done well at their program.

J.P.'s current social worker who was assigned to J.P.'s case in March 2021 also testified. He opined that, although Mother was adamant that J.P. should be placed in a psychiatric facility, J.P. was not likely to require long-term residential treatment. J.P. did not require any psychotropic medication to treat his conditions while at the group home, and the social worker did not observe any violent or depressive behavior. In the social worker's opinion, any negative behaviors J.P. exhibited were relatively minor and were consistent with symptoms of DMDD. J.P. was otherwise participating in all activities at the group home and had generally good behavior. The social worker was concerned, however, about the relationship between Mother and J.P. At that time, J.P. was refusing all contact with Mother and no longer wanted to be part of the family. Additionally, Mother did not believe she was capable of maintaining J.P. in her home, and J.P. described several

13

"concerning behaviors" by Mother, which J.P. attributed to the escalation of his own behavior.

Mother also testified at the hearing and denied the allegations in the petition. She claimed she was never asked to pick up J.P. when he was ready for discharge from the ESU. She admitted, however, that she was contacted about other temporary placement options for J.P. but had refused them. She also testified that it was not an option for J.P. to return home on February 22, 2021 because she believed J.P. was a danger to her and her daughters. Additionally, although Mother initially denied that she had refused to participate in a CFT meeting, she later testified that she had declined to participate in a "voluntary" meeting with the Agency in December 2020.

After receiving the evidence and hearing the parties' closing arguments, the juvenile court made a true finding on the petition under section 300, subdivision (b)(1). The court found that Mother and J.P. have a "very volatile relationship," which resulted in an unsafe home environment. The court noted that Mother's characterization of J.P. as violent drug dealer with gang affiliations was not supported by the other individuals involved in the case. The court also found that Mother's refusal to pick up J.P. from the ESU further strained the relationship, and that Mother's testimony that she was never given an opportunity to pick up J.P. was not credible. The court indicated that J.P. had demonstrated insight into his past mistakes, and his conduct was "impressive" and showed "a certain level of maturity[.]" The court concluded that although the petition could have been pled under section 300, subdivision (c), the allegations under subdivision (b)(1) had been proven by a preponderance of the evidence.

14

Following the jurisdictional hearing, the juvenile court held another meet and confer hearing on J.P.'s section 602 petition on June 9, 2021. According to the addendum reports the Agency prepared for the hearing, Mother was continuing to accuse J.P. of drug abuse. She provided the Agency with several photos of drug paraphernalia she found in J.P.'s room, but the Agency concluded that the photos showed only substances related to nicotine or marijuana, which J.P. had already admitted to using. Mother then provided a second batch of photos showing a bottle of Buprenorphine, Naloxene strips, empty syringes, and clear-plastic pill capsules. The social worker was advised by a law enforcement agent that these items were indicative of opioid use or opioid overdose treatment. When asked about the photos, J.P. claimed the items were given to him by a friend to treat an overdose.

Mother also continued to accuse J.P. of affiliating with gangs. She claimed she had heard reports from neighbors that J.P. was seen with "shady individuals." She also cited an incident when J.P. was held up at gunpoint, and that a local store had been "knocked over," although she had no information implicating J.P. in that incident. She also reported finding several small knives and brass knuckles in J.P.'s room.

The social worker addressed Mother's accusations in the addendum report and noted that, aside from one incident of drug-seeking behavior in March 2021, there had not been any reports of drug use or gang involvement by J.P. from the emergency shelter or group home. Overall, Mother's reports did not change the Agency's position that J.P.'s 602 petition should be dismissed and his dependency proceedings should continue.

At the meet and confer hearing, both Mother and J.P. were present. J.P.'s delinquency attorney and his dependency attorney agreed with the

15

Agency's recommendation and asked the juvenile court to dismiss the section 602 petition since the court had taken jurisdiction over J.P. under section 300. However, Mother's counsel opposed dismissing the petition, stating that Mother was "a victim in this case" and that J.P. should be held accountable. The district attorney concurred with Mother's position, contending that as the child's parent, her belief that J.P. should be "held accountable" should take precedent even though J.P. was "doing really well" at his current placement.

Mother also gave a statement to the juvenile court at the hearing, pushing for J.P. to be placed on probation. She continued to accuse J.P. of being violent, a drug abuser, and having gang affiliations. She also claimed the Agency's reports were inaccurate and that the social worker "talks down to [her]." In her opinion, J.P. should be under probation, and if the current rules were lifted, she believed he would "reuse and go back to the opioids and psychedelics and psychotropic drugs."

The juvenile court dismissed the 602 petition, finding J.P.'s interests were best served on the dependency side. The court noted that J.P. was doing "well" at his current placement, and that the option of moving him to a lower level of care would be addressed at the dispositional hearing.

D.    *The Contested Disposition Hearing*

The juvenile court held the contested disposition hearing on July 26, 2021. In the report prepared for the disposition hearing, the Agency recommended that J.P. remain out of Mother's care. The report also noted that J.P. and Mother's relationship "continued to stagnate," and there was "poor engagement" between the Agency and Mother. According to the report, J.P. was particularly upset that Mother pushed for him to be placed on probation. J.P. was otherwise doing well in treatment and was participating

16

in therapy and other activities. The Agency was also working with J.P. to find him a lower level of care. The report further noted that Mother had failed to return the "majority" of the social worker's calls but was communicating with the social worker through text and e-mail.

At the disposition hearing, the juvenile court admitted into evidence the Agency's reports. Mother's counsel did not offer any affirmative evidence, and no witnesses were called. The court had previously ruled it would consider any evidence presented at the contested jurisdiction hearing at the disposition hearing.

The parties discussed the juvenile court's no-contact order during the dispositional hearing. J.P. requested, through counsel, that the no-contact order remain in effect. J.P.'s counsel noted that the juvenile court previously found that contact would be detrimental to J.P., and there was no evidence that Mother had since engaged in any services that were conducive to improving their relationship. Although J.P. was doing well and had access to services at his current placement, the "stress" of visits with Mother could cause him to regress.

Mother's counsel objected to the no-contact order, contending that J.P.'s counsel had failed to provide any information showing that contact would be detrimental. Mother's counsel further contended that J.P.'s request to not have contact, standing alone, was insufficient to warrant the no-contact order. Additionally, counsel requested placement for J.P. in a high-level facility based on his "substance abuse issue, mental health, gang affiliation, and criminal behavior"; opposed any off-campus passes for J.P.; and requested J.P. be screened for fetal alcohol syndrome.

As for the Agency, it indicated that the evidence could support a detriment finding based on the "history of intensive conflict between [J.P.]

17

and his mother," and Mother's "combative and very aggressive" efforts to involve J.P. in the criminal system. The Agency believed contact "could set [J.P.] back and could endanger him emotionally and physically," given the allegations of "physical aggression" between Mother and J.P. Although the Agency stated that its "formal recommendation" was for supervised visitation between Mother and J.P., it also indicated that it would submit that issue to the court. The Agency further requested that J.P. continue to be detained out-of-home and provide the family with reunification services.

At the close of the dispositional hearing, the juvenile court ruled to keep the no-contact order in place. The court noted that Mother's "verbal abuse" of J.P. had caused or exacerbated his mental health problems. Mother's conduct throughout the proceedings also demonstrated that she was attempting "to control and punish him in the harshest ways possible." The court further noted that "[J.P.] is not a criminal, [J.P.] is not a gang member, and [J.P.] is not a drug addict. This is a kid with some mental health challenges, but he is doing really well right now." The court indicated that "nothing has changed as far as [Mother's] participation in services" since the court first instituted the no-contact order, and that contact between J.P. and Mother would be detrimental to the minor. The juvenile court then ordered to adopt the Agency's recommendations, removing J.P. from Mother's custody and ordering reunifications services for the family.

Mother timely appealed.

## DISCUSSION

Mother's sole challenge in this appeal is to the juvenile court's no-contact order issued at the dispositional hearing. She contends that the juvenile court lacked the authority to issue a no-contact order during the reunification period because family reunification will be impossible absent a

18

framework for establishing contact between mother and son. She also contends that the juvenile court abused its discretion by excusing J.P. from testifying at the dispositional hearing, since his testimony was material to determining whether contact between Mother and J.P. should be renewed.

1.    *The Juvenile Court's No-Contact Order Was Proper*

At the dispositional hearing, the juvenile court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family. (§ 361.5, subd. (a); Cal. Rules of Court, rule 1456(f)(1).) The reunification plan " 'must be appropriate for each family and be based on the unique facts relating to that family.' " (*In re Michael S.* (1987) 188 Cal.App.3d 1448, 1458.) The Agency must offer the parent services tailored to remedy the problems leading to the loss of custody. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006-1007 (*Christopher H.*).) Section 362, subdivision (d) states in relevant part: "The program in which a parent . . . is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."

Visitation between the child and parent is a component of a family reunification plan. (§ 362.1.) As section 362.1, subdivision (a) explains, the requirements for visitation exist "[i]n order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . ."

At the same time, "the parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense; the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*S.H.*).) The statute mandates that "[n]o visitation order shall jeopardize the

19

safety of the child." (§ 362.1, subd. (a)(1)(B).)  In addition, visitation orders must provide for "flexibility in response to the changing needs of the child and to dynamic family circumstances." (*S.H.*, at p. 317.)  Such visitation must be "as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A).)  "While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' [Citation.]" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.)

We first address Mother's contention that the juvenile court lacked the authority to issue a no-contact order during the reunification period.  At the dispositional hearing, the court ruled that the no-contact order should remain in effect after determining that contact between Mother and J.P. would be detrimental to the minor.  At the same hearing, the court also ordered to detain J.P. outside the home and for the Agency to provide reunification services.  Mother contends that the statute does not allow the juvenile court to issue a no-contact order based on a finding of detriment where, as here, reunification services have been ordered for the family.

Mother's contention, however, misapprehends the relevant statutory authority.  The plain language of section 362.1 expressly provides that the general entitlement to visitation during reunification is not limitless.  For instance, the statute not only authorizes, but *requires*, the juvenile court to deny visitation where the child's safety is at risk.  (§ 362.1, subd. (a)(1)(B); see also *In re T.M.* (2016) 4 Cal.App.5th 1214, 1219 (*T.M.*) [explaining that section 362.1 requires the court to deny visitation if the child's safety is at risk].)  Additionally, visitation is only required as frequently as the well-being of the child allows.  (§ 362.1, subd. (a)(1)(A).)

20

In applying this plain language of the statute, numerous courts of appeal have concluded that the juvenile court may deny a parent visitation during the reunification period where visitation would be harmful to the child's well-being. (See *In re Matthew C.* (2017) 9 Cal.App.5th 1090, 1093, 1101-1102 (*Matthew C.*) [reunification services must provide for visitation between parent and child, subject to two caveats set forth by § 362.1, subds. (a)(1)(A) and (a)(1)(B)]; *T.M.*, *supra*, 4 Cal.App.5th at pp. 1220-1221 [affirming order requiring progress in individual counseling prior to allowing visitation during the reunification period]; *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356-1357 (*Brittany C.*) [during reunification, visitation must be consistent with the well-being of the child]; *Christopher H.*, *supra*, 50 Cal.App.4th at p. 1008 [juvenile court may deny visitation during reunification when visitation would be harmful to the child's well-being].) As the appellate court in *Brittany C.* explained, if the juvenile court lacked the power to suspend visits when continuing them would be detrimental to the child, the court "would be required to sit idly by while a child suffered extreme emotional damage caused by ongoing visits. . . . Visits of that nature are hardly consistent with the well-being of the children." (*Brittany C.*, at p. 1357.) Thus, the pertinent caselaw and statutory authority are clear: the juvenile court may deny a parent visitation based on a showing it would be detrimental to the child, even where reunification services have been ordered.

Although the courts of appeal agree that visitation may be denied based on a showing of detriment, there is a lack of consensus regarding the standards for denying visitation in this context. For instance, there is a split of authority as to whether section 362.1 authorizes the denial of visitation only on a finding of a threat to the minor's physical safety (see *In re C.C.* (2009) 172 Cal.App.4th 1481, 1492 (*C.C.*)), or whether visitation may also be

21

denied based on a threat to the minor's emotional well-being (see, e.g., *Matthew C.*, *supra*, 9 Cal.App.5th at pp. 1101-1103; *T.M.*, *supra*, 4 Cal.App.5th at pp. 1219-1220). In *C.C.*, the appellate court construed the language in section 362.1 subdivision (a) to mean that "when reunification services have been ordered and are still being provided . . . some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety*." (*C.C.*, at p. 1491.) However, the physical safety limitation set forth by *C.C.* appears to be the minority view, as other appellate courts have determined that visitation may be suspended or denied where it would be detrimental to the child's emotional well-being. (See *T.M.*, at p. 1219 [collecting cases].)

In her appellate briefs, Mother does not address this split of authority, nor does she contend that the juvenile court's order denying visitation was improper absent evidence of a threat to J.P.'s physical safety. Accordingly, she has forfeited any such contention. (See *People v. Aguayo* (2019) 31 Cal.App.5th 758, 768 [failure to develop claim with reasoned legal argument and supporting authority forfeits the issue].)

In any event, we concur with the courts of appeal which have concluded that the juvenile court may deny visitation based on potential harm to the child's emotional well-being. As the appellate court in *T.M.* explained: "[T]he plain language of section 362.1, subdivision (a) only requires visitation as frequently as the well-being of the child allows. Accordingly, if visitation is not consistent with the well-being of the child, the juvenile court has the discretion to deny such contact . . . . '[W]ell-being' includes the minor's emotional and physical health. [Citations.]" (*T.M.*, *supra*, 4 Cal.App.5th at p. 1219.) "This reading of the statute is consistent with dependency law's guiding principle of the well-being of the child: 'While visitation is a key

element of reunification, the court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300." [Citation.]' [Citations.]" (*Id.* at p. 1220.)

Another inconsistency in the law pertains to the standard of proof when a finding of detriment is required to deny visitation. (*In re Manolito L.* (2001) 90 Cal.App.4th 753, 761-762 [preponderance of the evidence standard of proof applies]; *In re Dylan T.* (1998) 65 Cal.App.4th 765, 773-774 [clear and convincing evidence standard of proof applies.].) There also appears to be some disagreement regarding the standard of review. Although visitation orders are generally reviewed for abuse of discretion (see, e.g., *Brittany C.*, *supra*, 191 Cal.App.4th at p. 1356; *In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 837-838 (*Daniel C.H.*)), some courts have indicated that there must be substantial evidence to support the finding of detriment where visitation has been denied (see, e.g., *C.C.*, *supra*, 172 Cal.App.4th at p. 1492; *In re Mark L.* (2001) 94 Cal.App.4th 573, 580, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989). Under either standard, however, we conclude the no-contact order was proper. (*T.M.*, *supra*, 4 Cal.App.5th at p. 1219 [acknowledging the discrepancy among courts regarding the standard of review, and concluding that the juvenile court's order to deny visitation was proper under either standard.].)

After the juvenile court instituted the no-contact order in March 2021, Mother had several months to work on repairing her relationship with J.P. However, instead of focusing on services that would facilitate reunification, Mother became increasingly fixated on controlling and punishing J.P. for his past behavior. For instance, she personally testified during two separate hearings to push for J.P. to be placed on probation and declared a juvenile

justice ward. She testified that J.P. was unequipped to go "back into society," and she accused him of suffering from "socialization issues," abusing drugs, and affiliating with gangs. She gave this testimony in J.P.'s presence, and the court had to intervene several times to remind Mother that the focus of the proceedings was on J.P.'s well-being. The Agency's reports are also replete with references to Mother's attempts to characterize J.P. as a violent drug addict with gang affiliations.

Mother's conduct during these proceedings has not been conducive to repairing her relationship with J.P., and J.P. was particularly upset that Mother pushed for him to be placed on probation. Additionally, Mother's accusations about J.P.'s bad behavior have not been confirmed by any of the other parties involved in the case. Although J.P. has admitted to prior drug use, there have been no reports that he has abused drugs or affiliated with gangs during his placement at the shelter or the group home. Instead, J.P. has complied with curfew, participated in therapy and other activities, and has generally done "well" during his out-of-home placements. Mother's opinion that J.P. requires a highly restrictive treatment facility is also not shared by J.P.'s treating professionals. For example, despite Mother's protestations that J.P. needed to be locked down in a facility, staff at the ESU determined that once J.P. was ready for discharge, he did not require placement in a psychiatric unit. J.P.'s current social worker also confirmed that J.P. was not likely to require long-term residential treatment, and any negative behaviors J.P. exhibited were relatively minor. The Agency and Probation also agreed that, contrary to Mother's position, J.P.'s well-being could be adequately addressed through the dependency proceedings, and it was in J.P.'s best interests to dismiss the 602 petition.

The circumstances that led to this dependency case also indicated that Mother and J.P. had a dysfunctional and volatile relationship to such a degree that contact between them could be harmful. J.P. reported that Mother verbally abused him, claiming she called him fat and ugly, told him, "You're not my son," and told him to kill himself. He also shared that he felt suicidal in the past and had a history of self-injurious behavior, and he believed Mother's behavior contributed to his anxiety and depression. The sustained allegations in the petition also described Mother's failure to provide a home for J.P. and her refusal to provide him with alternative housing arrangements once he was ready for discharge from the ESU. In other words, absent Agency intervention, Mother's conduct would have left J.P. homeless. The juvenile court thus reasonably found that Mother's behavior had caused or at least exacerbated J.P.'s mental health issues, and that continued contact would be detrimental.

Mother has also failed to express any insight into her responsibility for her strained relationship with J.P. Notably, Mother did not present any evidence at the dispositional hearing, and she has not identified any evidence in this appeal, to explain why contact would *not* be detrimental. Additionally, although Mother has attended therapy, it appears she has only addressed ways for her to deal with J.P.'s mental health issues, and there is no indication that she has developed any insight regarding the circumstances that led up to these dependency proceedings. This includes her refusal during the jurisdictional hearing to acknowledge that she declined to pick up J.P. when he was ready for discharge from the ESU. She also testified at the same hearing, however, that she refused the alternative housing arrangements for J.P. that were offered to her, and conceded that she was unwilling to accept J.P. back into her home when he was ready for discharge

25

from the ESU. Since Mother's testimony on this issue was internally inconsistent, the juvenile court was justified in deeming her testimony as not credible.

Overall, evidence in the record supports the juvenile court's finding that contact between J.P. and Mother could be detrimental to J.P.'s well-being. This included the Agency's reports that were submitted into evidence at the dispositional hearing, the evidence presented during the contested jurisdiction hearing, and the court's observations of Mother during the proceedings. Based on the totality of this evidence, it was reasonable for the court to conclude at the disposition hearing that contact with Mother would be detrimental to J.P.'s well-being. (See *T.M.*, *supra*, 4 Cal.App.5th at pp. 1220-1221 [denying visitation between father and child was appropriate where the minor was fearful of his father and did not want any visitation, and father had not addressed his own anger issues, did not appear to recognize the harm his behavior was causing, and displayed offensive and disruptive behavior during court proceedings]; *Brittany C.*, *supra*, 191 Cal.App.4th at pp. 1356-1357 [juvenile court could suspend visitation during reunification, where visits were "emotionally traumatic" to the children and the parent-child relationship had not improved over the course of the proceedings].)

Mother implies that, despite the juvenile court's finding that contact between her and J.P. would be detrimental, a no-contact order during the reunification period violates her Fourteenth Amendment interest in the companionship, care, custody, and management of her son. However, "[r]eunification services are a benefit, and there is no constitutional 'entitlement' to these services." (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 476.) Additionally, the statutory process provides Mother with the

26

opportunity to revisit the no-contact order with the juvenile court during subsequent hearings, which includes the parties' upcoming six-month review hearing set for January 2022. Mother may also file a section 388 petition to request to modify the no-contact order. Indeed, any party in the proceedings can move for the modification of a visitation order pursuant to section 388 based on a change of circumstance or new evidence, and where it appears that the best interests of the child may be promoted by the proposed modification. (§ 388, subds. (a)(1) and (d).) Thus, the reunification process affords "ample opportunity" for the juvenile court to reconsider the appropriateness of the no-contact order. (See *T.M.*, *supra*, 4 Cal.App.5th at p. 1220.)

Mother also contends that the no-contact order dooms her opportunity for reunification because while under the no-contact order, she is unable to complete various aspects of the Agency's case plan. She notes that that the case plan requires her to attend one-on-one visits and therapeutic visits with J.P., as well as provide him with emotional care during in-person and telephone visits.

Mother's argument, however, neglects other aspects of the case plan that are not premised on her having direct contact with J.P. For instance, the case plan describes general service objectives for Mother, which include showing her ability to understand J.P.'s feelings and give emotional support; paying attention to and monitoring J.P.'s health, safety, and well-being; and showing her ability and willingness to have custody of J.P. The case plan further provides that Mother "will apply what she learns about parenting youth with mental health needs, and consult with [J.P.'s] service providers to better understand what J.P. is going through and his emotional needs." These aspects of the case plan, which rely on her cooperation with the social

27

worker and J.P.'s providers, are focused on guiding Mother towards reunification and do not require any direct contact between mother and son.

Moreover, the juvenile court's no-contact order is aimed at facilitating the family's chances of reunification, rather than hindering it. In support of its finding that contact would be detrimental, the court noted that Mother "does have a history of being verbally abusive to [J.P.], and that verbal abuse has either caused or exacerbated his mental health issues." Given these volatile family dynamics, the no-contact order provided the family with a cooling-off period and allowed J.P. and Mother to begin the reunification process by focusing on their individual therapy and other reunification measures that did not require direct contact. We view this measure by the court as an effort to ensure mother and son are emotionally prepared to have a healthy relationship and can hopefully reunite in the future. (See *Brittany C.*, *supra*, 191 Cal.App.4th at p. 1357 [juvenile court's order suspending visitation and ordering individual therapy for the children was not arbitrary and appeared to be the only hope the family had of reuniting]; see also *Matthew C.*, *supra*, 9 Cal.App.5th at p. 1102 [finding it "exceedingly unlikely that such emotionally traumatic visits [between the parent and child] would do anything to advance a parent's reunification prospects, and, indeed, they might very well derail them."].)

Mother also repeats throughout her briefing that the juvenile court's no-contact order is "unconditional" and implies that the order is overly broad. To the extent she suggests that the court should have allowed *some* contact between her and J.P.—such as telephone calls or written communication— she did not raise these options in the juvenile court. She has therefore forfeited any argument that alternatives to the blanket no-contact order should have been considered, since it is the parent's burden to request

28

modifications to a visitation order and not the court's burden to propose such modifications sua sponte. (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1046 [indicating that changes to a visitation order "are better handled, in the first instance, through communications with [the Agency], and as needed, through motions to modify the visitation order. It is the parent's burden to initiate those procedures, not the court's."].) Further, even if these alternative options for contact between Mother and J.P. had been raised, courts of appeal have authorized no-contact orders where, as here, the evidence supports a finding that contact would be detrimental to the minor. (See *Daniel C.H.*, *supra*, 220 Cal.App.3d at p. 839 ["Although the evidence here might have supported an order of closely supervised visitation, the evidence of stress on [the minor] is equally supportive of a no contact order."]; *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1238 [juvenile court's no-contact order between mother and child was "reasonable" where mother had not protected the child from sexual abuse and where evidence showed child was angry with mother and was refusing visits].)

2. *The Juvenile Court Did Not Abuse Its Discretion by Not Compelling J.P. to Testify at the Disposition Hearing*

Mother contends the juvenile court abused its discretion by excusing J.P. from testifying. She asserts that his testimony was "material to the prospect of renewing his contact with his family," and thus he should have been compelled to testify at the dispositional hearing.

As a preliminary matter, Mother did not request for J.P. to testify at the contested disposition hearing on July 26, 2021. In fact, Mother's counsel did not offer any affirmative evidence, and no witnesses were called to testify at the disposition hearing.

Although Mother raised the matter of J.P. testifying at an earlier hearing on June 4, 2021, her counsel's arguments at that hearing indicated

29

that J.P.'s testimony was only necessary on the jurisdictional issues. Specifically, counsel contended J.P.'s testimony might be necessary for her argument that jurisdiction should be taken under section 300 subdivision (c), not subdivision (b)(1), and requested an opportunity to brief the matter "for the jurisdictional purposes." Then, in ruling that J.P. should not be compelled to testify, the juvenile court found that J.P.'s testimony was not material to the jurisdictional issues, stating: "[T]he Court hasn't heard anything that would indicate that [J.P.'s] testimony would be relevant or material to the allegations in the petition, and the interactions with his mother up to this point have been traumatic for him, so the Court is not inclined to force him to testify, particularly because it doesn't appear as though anything he has to say would be able to shed light on the allegations as pled." Thus, Mother's request for additional dispositional testimony, raised for the first time in this appeal, is forfeited due to her failure to request such testimony in the trial court. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222.)

However, even if Mother's argument is not forfeited, she has not shown that J.P.'s testimony would have been material to the no-contact order. The juvenile court may properly exclude a child's testimony "where the issues to be resolved would not be materially affected by the child's testimony, and where it is shown that the child would be psychologically damaged by being required to testify." (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1089.) While Mother does not contest the juvenile court's finding that forcing J.P. to testify would have been emotionally traumatic for him, she contends that his testimony is "material on the dispositional matter of renewing contact with his mother (and his sisters)." However, Mother incorrectly characterizes the juvenile court's no-contact order as premised on J.P.'s refusal to visit with

30

Mother. Rather than relying on J.P.'s expressed wishes, the court determined that the no-contact order should remain in effect at the disposition hearing on July 26, 2021 primarily due to Mother's own behavior. The court noted that Mother had verbally abused J.P. in the past, and that she repeatedly showed a desire to control and punish J.P. "in the harshest ways possible" over the course of the proceedings. Thus, J.P.'s testimony would not have materially affected the court's resolution of the no-contact order.

## DISPOSITION

The orders of the juvenile court are affirmed.


HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DATO, J.

31