Filed 8/29/24  S.L. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| S.L., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF KERN COUNTY, <br><br> Respondent; <br><br> KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Real Party in Interest. | F088143 <br><br> (Super. Ct. No. JD144752-01, JD144753-01) <br><br><br> **OPINION** |

-ooOoo-

## THE COURT*

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Susan M. Gill, Judge.

Godinez Law and Diane E. Godinez for Petitioner.

No appearance for Respondent.

Margo A. Raison, County Counsel, and Carissa A. Edwards, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

\*       Before Levy, Acting P. J., Franson, J. and DeSantos, J.

S.L. (mother) petitions this court for extraordinary writ relief (Cal. Rules of Court, rule 8.452)[1] seeking review of the juvenile court's order denying mother reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(5) and (6)[2] and setting a permanency planning hearing for September 24, 2024, under section 366.26 as to her children A.C. and D.C. (together, the minors). Mother contends substantial evidence does not support the court's findings of jurisdiction under section 300, subdivisions (e) and (i), and that it erred in bypassing reunification services pursuant to section 361.5, subdivision (b)(5) and (6). We deny the petition as well as mother's related request for a stay of the section 366.26 proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

The minors were initially removed from mother's care shortly after their birth in June 2023, due to mother's ongoing substance abuse and her failure to reunify with the minors' older sibling. The minors were subsequently returned to mother's care at the disposition hearing held on November 28, 2023, and mother was ordered to participate in ongoing family maintenance services, as outlined by the Kern County Department of Human Services (department). Social worker Stephanie Valdovinos-Renteria (Valdovinos) had been assigned the case since its inception.

During the period of family maintenance, an Interstate Compact on the Placement of Children (ICPC) was filed for Texas where the minors' great-grandmother, G.E., (great-grandmother) lived. The department subsequently authorized mother to move to Texas with the minors at the end of January 2024.

On February 18, 2024, Valdovinos received a voicemail from an Arkansas social worker regarding a " 'near fatality' " incident involving one of the children, who was

---

[1]     All further references to the rules are to the California Rules of Court.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

currently admitted into an Arkansas children's hospital and on a ventilator in critical condition.[3] When Valdovinos followed up, she learned that the Arkansas Department of Human Services (ADHS) received a call that A.C. was not breathing and mother's live-in boyfriend, Skylar Dodge (Dodge), had slammed the child into the wall several times, leaving the child with a skull fracture and almost lifeless. At the time, A.C. was in the pediatric intensive care unit "as a DND since they were not sure if the child would be living or not," and D.C. had been detained by ADHS, which recommended that the department come pick up the children and return them to California.

On February 21, 2024, the department filed a section 342 supplemental petition alleging the minors were at risk of harm due to mother's failure to protect A.C. from her boyfriend's actions that resulted in life-threatening injuries to A.C. At the detention hearing on February 22, 2024, the juvenile court ordered the minors detained and a jurisdiction and disposition hearing was set for April 24, 2024.

On March 5, 2024, mother filed a request for an ex parte hearing, wherein she asked the court to allow her to visit A.C. while she was hospitalized. The department opposed the request and filed a supplemental report in which it outlined mother's denial that A.C. had any injuries prior to the February 18, 2024 incident. After being shown earlier photos of A.C. with cuts and bruises, mother then said A.C. scratched herself to cause the injuries.

At the ex parte hearing on March 6, 2024, the juvenile court continued the matter to further investigate whether great-grandmother would be an appropriate option to supervise mother's visits with A.C. at the hospital.

On March 20, 2024, the department filed a second supplemental report that included contacts made by Valdovinos with mother prior to the incident in which A.C. was injured. Valdovinos reported that when she first encountered Dodge during a visit to

---

[3] Great-grandmother apparently now lived in Arkansas.

mother's home on January 17, 2024, mother reported that Dodge was her boyfriend but denied that he lived in the home or that he planned to move to Texas with her. Mother was warned that she needed to inform the department if Dodge did live in the home or was planning on moving with her.

When mother spoke to Valdovinos on January 18, 2024, mother said she was moving to Texas and taking her belongings and "both children only." Mother insisted that she would be traveling alone with the children. She repeated this assertion to Valdovinos on January 25, 2024.

On February 26, 2024, after the incident in which A.C. was injured, mother told Valdovinos that she and Dodge had been in a relationship since September 2023, and he moved into her home in December 2023. Mother claimed she did not know she needed to let the department know this. When reminded that she had been told to report any changes of anyone in the home, mother then said that Dodge had not lived with her but slept over a couple of times. Dodge proposed to mother on February 8, 2024, after the move to Arkansas.

Mother reported to Valdovinos that she was not aware of Dodge's criminal history, except that he had gone to jail for selling and smoking drugs. When reminded that the minors could not be around marijuana, mother denied Dodge smoked in the house and denied that law enforcement found drug paraphernalia in the home. Mother denied that Dodge displayed angry or aggressive behaviors towards her or the minors, but she did not answer when asked if he had displayed angry or violent behaviors towards others.

On March 7, 2024, Valdovinos contacted great-grandmother, who reported being mother's biggest support system and said she tried to see the minors every day after work, although she had not seen the minors the week before the February 18, 2024 incident. Great-grandmother had not noticed any angry or aggressive behaviors on Dodge's part, but she admitted that she did not know him well. Mother had called great-grandmother on February 18, 2024, to say that something was wrong with A.C.

4.

Great-grandmother went to mother's home and then drove with mother and Dodge to the hospital where A.C. was being treated. According to great-grandmother, Dodge told her he walked into A.C.'s room and found her lying on the floor. Mother had voiced concern to great-grandmother about leaving the children in Dodge's care, stating that if she needed childcare, she would leave the children with great-grandmother.

At the hearing held on March 20, 2024, the juvenile court denied mother's request to visit with A.C. while she remained hospitalized in Arkansas. The court found mother's credibility "suffering greatly," as she had not been honest about Dodge living with her, about him moving with her to Texas and Arkansas, or about A.C.'s injuries. The court described A.C. as having been "essentially tortured" while under mother's care, and that, even if Dodge was the one injuring A.C, it was mother's responsibility to protect A.C. and she failed to do so.

In the department's report filed in anticipation of the jurisdiction hearing, the department chronicled law enforcement's response to mother's call that A.C. was injured. Mother and Dodge gave various versions of the events causing A.C.'s injuries. Dodge claimed he was taking care of A.C. when he responded to D.C. crying in the other room. He then heard a loud thud on the wall and returned to A.C.'s room and found her gasping for air. He thought she had had a seizure. He yelled at mother to get out of the shower and he poured water over A.C.'s head, thinking it would help her. Mother reported that she was in the shower, heard a loud noise, and Dodge yelled at her to come to the bedroom, where she saw A.C. had a large knot on her head and blood in her mouth. Mother told Dodge to call 911 and great-grandmother.

When Dodge was later told A.C.'s injuries were not consistent with his story, Dodge became emotional and admitted that he lied about what happened. He then said he was holding A.C. in his arms when D.C. began to cry loudly, which scared him. He then threw A.C. against the wall, which caused her to hit her head and then hit her head again on the floor.

5.

Detectives spoke to mother again, who told them Dodge had sent her messages while they were in the interview room and told her to delete messages between them. Dodge was arrested and charged with first degree domestic battery.

On February 20, 2024, mother called Valdovinos to ask if she had heard what had happened to A.C. Mother told Valdovinos that she was in the shower when she heard Dodge scream that A.C. was not breathing. When she asked Dodge what happened, he told her A.C. fell and stopped breathing. Mother then said she was "unsure" what had occurred because Dodge also admitted to her that he had " 'slammed [A.C.] into the wall.' "

A.C.'s injuries were found to be severe and life-threatening, including a right occipital fracture, MRI brain findings concerning for anoxia, a left femoral fracture, a right globe hemorrhage, bilateral retinal hemorrhages, a T6 compression fracture, and spinal canal hemorrhage. A physician found A.C.'s injuries "were not sustained from one event of hard impact, but multiple [events] within the same timeframe." While A.C. had the ability for some level of improvement in functional status, she likely would have "significant compromise in her neuro-development potential and [an] overall shortened life span as a result of the severe nature of her head injury from abuse."

At the jurisdiction hearing on April 24, 2024, mother testified that she met Dodge three years ago and they eventually began dating in September 2023. Dodge saw the minors regularly and mother described him as "really caring" and "really good" with them, but that she never left him alone with them. Since Dodge spent so much time in her home, "it never occurred" to mother that Valdovinos would want to know that Dodge was going to be around the minors.

Mother testified that she told Valdovinos about Dodge on January 17, 2024, and that she provided Valdovinos with Dodge's information at that time for a background check. Mother claimed to have informed Valdovinos that Dodge planned to move to Arkansas with her. Mother gave various versions of how A.C. was injured and eventually

stated she was not sure how the injury happened. Mother denied injuries to A.C. in other photos taken before the February 18, 2024 incident showing a large scratch and bruise; mother described the scratch as minor with a scab and the bruise as "cookies" on A.C.'s face.

Following argument, the juvenile court found the section 300, subdivisions (b), (e), and (i) allegations true as amended, and the subdivisions (e) and (i) allegations true "beyond a reasonable doubt."[4] The court emphasized mother's serious credibility issues, noting again that mother had not been honest with the social worker, had not been honest throughout the case, and had not been honest in her testimony that day. In conclusion, the court stated:

> "I think it absolutely belies logic, credibility, every ounce of common sense to believe that someone who is gentle and kind and loving, first of all, isn't to be trusted with your children while you go to the store or while you go to the doctor or while you go down the street.[5] Second of all, that somebody so kind and gentle and loving and nurturing would not just accidentally drop a child, would not just supervise a child inadequately, but actually throw a child so hard against a wall that the child then has skull fractures on both sides of her head. That she would fall to the ground with such force she's going to be blind the rest of her life, most likely. She's going to be hearing impaired the rest of her life, most likely. And there is a possibility she will be in a persistent vegetative state the rest of her life. That is not a condition that comes from someone's accidental startle reflex when another child cries. That is something that happens, as people have said here, by a monster. And a monster's true colors do not come out of nowhere. [¶] This mother knew."

At the subsequent disposition hearing on May 28, 2024, the juvenile court adjudged the minors dependent pursuant to section 342, found mother had made no

---

[4] Section 300, subdivisions (b), (e), and (i) were each amended to remove the statement that the child had "healing fractures to the pelvis and arm." And changed the wording in the sentence that read "The child is on a ventilator and in critical condition" to "The child was on a ventilator and was in critical condition."

[5] Mother testified at the hearing that she never left the minors with Dodge while she went to the store, etc.

progress toward alleviating or mitigating the reasons the minors were removed, and found by clear and convincing evidence that A.C. came within the bypass provisions of section 361.5, subdivision (b)(5),[6] as mother knew of the risk of great physical harm by Dodge and failed to protect her, thereby contributing to the abuse. The court further ordered services bypassed pursuant to section 361.5, subdivision (b)(6).[7] The court emphasized that it found mother "complicit in the deliberate abuse of A.C."

A section 366.26 hearing was scheduled for September 24, 2024. Mother's petition for extraordinary writ was filed on July 2, 2024.

## DISCUSSION

*Jurisdictional Findings*

Mother contends the juvenile court erred in exercising jurisdiction over the minors because allegations under section 300, subdivisions (e) and (i)[8] are not supported by substantial evidence.

As an initial matter, we reject mother's contention as to jurisdictional findings because she does not challenge the juvenile court's decision to sustain the section 300, subdivision (b) count. It is well established that when a petition alleges multiple grounds

---

[6] Section 361.5, subdivision (b)(5) allows for bypass of services if the child was brought within the jurisdiction of the court under section 300, subdivision (e) because of the conduct of that parent.

[7] Section 361.5, subdivision (b)(6) allows for bypass of services if the child has been adjudged a dependent of the juvenile court as a result of the infliction of severe physical harm to the child or sibling of a child by a parent, and it would not benefit the child to pursue reunification services.

[8] Section 300, subdivision (e) alleges that the child is under the age of five and has suffered severe physical abuse by a parent or by any person known to the parent if the parent knew or should have known that the person was physically abusing the child. Subdivision (i) alleges that the child has been subjected to act or acts of cruelty by the parent or member of his or her household, or the parent has failed to adequately protect the child from such act or acts of cruelty when the parent should have known that the child was in danger of such acts.

for jurisdiction, we will affirm if any one of the statutory bases for jurisdiction is supported by substantial evidence.  (*In re A.F.* (2016) 3 Cal.App.5th 283, 290; *In re Ashley B.* (2011) 202 Cal.App.4th 968, 979.)  In addition to the section 300, subdivisions (e) and (i) allegations that mother contests, the court sustained the section 300, subdivision (b) allegation, which alleges that the child has suffered, or there is a substantial risk of harm that the child will suffer, serious physical harm or illness as a result of the failure of the parent to adequately supervise or protect the child.  Here, mother's failure to challenge the subdivision (b) allegation provides sufficient basis for us to affirm the court's exercise of jurisdiction.

Because the jurisdictional findings also form the basis for the bypass of reunification services, which mother also contests, we will nonetheless address the sufficiency of the evidence as it relates to the section 300, subdivision (e) allegation.

As noted above, a child comes within the definition of section 300, subdivision (e) if "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child."  Mother acknowledges A.C. was under the age of five and suffered severe injury by a person known to her, but she contends there is insufficient evidence that she knew by active or constructive knowledge that abuse was occurring to either of her children.

To support her argument, mother cites her testimony at the jurisdictional hearing, in which she testified that she had known Dodge for three years; had seen him with another woman's child and admired his interactions with the child; and had never seen him lose his temper with the minors and was "really good" with them.  She also testified that after Dodge admitted to police that he had abused A.C., she was shocked and immediately threw his things out of the home and had no contact with him.

In reviewing a juvenile court's jurisdictional findings for substantial evidence, we review the record in the light most favorable to the court's determination, drawing all

9.

reasonable inferences in support of the court's findings. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) In conducting this analysis, "[w]e do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) We affirm the court's findings as long as a reasonable trier of fact could have reached it. (*In re I.J.*, at p. 773.) For these reasons, a party challenging the sufficiency of the evidence on appeal bears an " 'enormous burden.' " (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

At the conclusion of the jurisdictional hearing, the juvenile court specifically found that the section 300, subdivision (e) allegation, as amended,[9] was true "beyond a reasonable doubt." In making its findings, the court emphasized mother's complete lack of credibility in the past, throughout the case, and in her testimony that day. This lack of credibility is evident throughout the department's reports, which depict mother as hiding her relationship with Dodge, lying to Valdovinos about her relationship with him, and her plans to have him move with her to Arkansas. Her lack of credibility is also evident in her inconsistent statements made to various agencies and during her testimony in court as to the events of A.C.'s injuries. And while mother described Dodge as kind, gentle, and loving, she also stated that she never left the minors in his care without her.

As noted above, in reviewing the juvenile court's ruling for substantial evidence, we do not reweigh the evidence or substitute our own credibility determinations for those of the court. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.) All of the evidence before the court supports its findings that mother should have known and likely did know of the abuse by Dodge. We reject mother's argument to the contrary.

*Bypass of Services*

As a general rule, when a child is removed from parental custody under the dependency laws, the juvenile court is required to provide reunification services to "the

---

**9**　　See footnote 4.

10.

child and the child's mother and statutorily presumed father …." (§ 361.5, subd. (a)). However, it is also the "intent of the Legislature, especially with regard to young children, … that the dependency process proceed with deliberate speed and without undue delay." (*Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1151.) Thus, the statutory scheme recognizes that there are cases in which the delay attributable to the provision of reunification services would be more detrimental to the minor than discounting the competing goal of family preservation. (*Ibid.*) Section 361.5, subdivision (b) exempts from reunification services "those parents who are unlikely to benefit" from such services or for whom reunification efforts are likely to be " 'fruitless.' " (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 470, 474.)

The statutory sections authorizing denial of reunification services are sometimes referred to as "bypass" provisions. (*Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 821.) In the present case, the juvenile court denied reunification services to mother based on two such bypass provisions, section 361.5, subdivision (b)(5) and (6). Since only one valid ground is necessary to uphold the court's bypass decision, we focus here on section 361.5, subdivision (b)(5). (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121.)

Section 361.5, subdivision (b)(5) permits the denial of reunification services when the juvenile court finds by clear and convincing evidence that the "child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent …." (§ 361.5, subd. (b)(5).) Thus, a denial of services under section 361.5, subdivision (b)(5) is predicated on a jurisdictional finding that the child is under the age of five and "has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." (§ 300, subd. (e).) " '[S]evere physical abuse' " includes, as relevant here, "any single act of abuse that causes physical trauma

11.

of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death .…" (*Ibid.*)

At a dispositional hearing, the juvenile court's findings must be made on clear and convincing evidence. On review, we employ the substantial evidence test, bearing in mind the heightened burden of proof. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Once the court finds that the child is as described by section 361.5, subdivision (b)(5), the general rule favoring services no longer applies, and the court is prohibited from ordering reunification services "unless it finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c)(3).) The parent bears the burden of proving that services would be likely to prevent reabuse. (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163–164.)

Mother contends, as she does in contesting the jurisdictional findings, that the evidence is insufficient to find that she knew or should have known "Dodge could inflict this type of abuse on her child." Again, she argues that she had no reason to know Dodge could or would inflict such injuries and, once she heard of Dodge's actions, she cut off all contact with him and threw away his personal items and, "[s]ince that time, she has been steadfast in her position that she wants to have nothing to do with him."

We reject mother's claim. As we addressed above, substantial evidence supports the juvenile court's findings that mother had actual knowledge of the abuse and was thereby complicit in the infliction of physical harm, justifying the bypass of services pursuant to section 361.5, subdivision (b)(5).

## DISPOSITION

The petition for extraordinary writ and request for a stay are denied.

12.