Filed 6/18/26  In re J.D. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.D., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>K.M.,<br><br>    Defendant and Appellant. | A175105<br><br>(Alameda County Super. Ct. No. JD-035805-01) |

K.M. (mother) appeals a juvenile court order denying her request to return her son, J.D., to her custody.  (Welf. & Inst. Code, § 366.22, undesignated statutory references are to this code.)  She argues there was insufficient evidence that returning J.D. presented a substantial risk of detriment to his physical and emotional well-being.  We affirm.

## BACKGROUND

We are familiar with the facts of this case, having recently considered them in a related dependency writ involving mother's youngest son, J.C. (*K.M. v. Superior Court* (Feb. 9, 2026, A175113) 2026 Cal.App. Lexis 932

1

[nonpub. opn.].)[1] Mother also has a 16-year-old son, A.S. Neither are the subjects of this appeal. The facts relevant to J.D. are discussed below.

In January 2023, mother reportedly left the children unsupervised at home in Berkeley for between five and six hours. A.S., who was 12 years old at the time, was left to watch his younger siblings. He fell asleep, and J.D. wandered alone outside the apartment searching for mother. Officers who responded to the home observed J.D. in soiled pull-ups filled with layers of hardened feces. Feces leaked out of the pull-up onto his leg. The soiled pull-up resulted in severe diaper rash on J.D.'s buttocks and legs. It also appeared that the home had not been cleaned in months, and it smelled of spoiled food, urine, and feces. The children's room did not have any beds, indicating they slept on the floor. When mother returned home, she attacked law enforcement. She was under the influence, and officers arrested her. The three children were ultimately detained, and J.C. and J.D. were placed in the same resource family home.

Based on this incident, the Alameda County Social Services Agency (Agency) filed a juvenile dependency petition for all three children. As relevant here, the Agency alleged there was a substantial risk of J.D. suffering serious physical harm or illness as a result of mother's inability to adequately supervise or protect him, her failure to provide him with adequate food, clothing, shelter or medical treatment, and her inability to care for him due to her own substance abuse. (§ 300, subd. (b)(1)(A), (C), (D).)

_____

[1] J.C. was also the subject of the dependency petition, and the juvenile court heard the matters related to him as well. We denied mother's writ petition seeking extraordinary relief from an order terminating reunification services and setting a permanency planning hearing for J.C. (*K.M. v. Superior Court, supra,* A175113.)

According to the Agency's jurisdiction and disposition report, J.D. — then five years old — threatened to kill himself, mother, and his siblings. He had significant tantrums, involving screaming, hitting his head against the wall, and punching himself in the head. His caregiver reported that he played with his own feces and struggled to independently use the bathroom. Sometimes, he smeared feces on the bathroom wall and pulled out his hair when frustrated. Although he displayed developmental concerns — including speech delays and hyperactivity — he did not have any severe developmental diagnosis. Rather, a developmental specialist noted he showed signs of significant trauma and autism. His teacher reported he only knew about 20 letters and could only count to eight.

J.D. also exhibited sexualized behaviors, such as flicking his and J.C.'s genitals. In conversations with the Agency social worker, mother alluded to concerns A.S. had previously sexually abused J.D. while staying at their grandmother's house. When she tried to discuss the issue with J.D., he gave conflicting statements — alternatively indicating that A.S. hurt him and touched his private parts, and denying anything occurred. In the report, the social worker expressed concerns regarding J.D.'s clear neglect, trauma, potential sexual abuse, and mother leaving J.D. in A.S.'s care despite indications of sexual abuse.

Mother reported being drug free for several years and that she had been attending an outpatient substance abuse treatment program in San Francisco, where she received methadone. J.C.'s father reported seeing mother give J.D. methadone to calm him down. The social worker gave mother referrals to different programs to receive support but, despite program efforts to connect, she failed to respond. After several weeks, mother completed prescreenings and preassessments with the programs.

At the combined jurisdictional and dispositional hearing, the juvenile court found the petition allegations true, declared J.D. and his siblings dependents, and removed them from her custody. It also ordered family reunification services and mother to comply with her case plan, which included completing parenting classes, taking accountability for her actions that led to the removal of the children, participating in outpatient treatment, complying with random drug testing, and maintaining a suitable residence for herself and the children free of possible hazards.

During the reunification period, mother demonstrated progress with certain aspects of her case plan. Initially, she tested positive for alcohol on three consecutive dates and missed drug testing. Later, she regularly tested for drugs and alcohol and was consistently negative. She also participated in parenting services and individual therapy, reporting that she benefited from services to address her anxiety and depression. Mother and the children attended family therapy to cope with past trauma, increase stability with foster care, and repair her relationship with the children. She acknowledged leaving J.D. in her older son's care so she could obtain her methadone from the clinic in San Francisco. She also explained that the poor condition of her home — which ultimately led to J.D.'s removal — was the result of her depression. But she denied giving J.D. methadone to calm him and instead blamed A.S. for giving it to him.

After initial failures to maintain a residence free of hazards, blocked exits, and excessive trash — all to be verified by an Agency social worker — mother eventually organized her home two years after the dispositional hearing. She cleared the walkways, organized the kitchen and stocked it with food, and placed beds in the children's room. She recommended A.S. and J.D. sleep in separate rooms to prevent additional sexual abuse. Mother

4

also installed a lock box in her closet with a combination lock to store her methadone. But some problems remained — her bed was broken and piled with clothing and household items, a kitchen light did not work, and she needed to confirm whether she had electricity. The Agency explained she could not have overnight visits with J.D. until these issues were addressed. In addition, while mother had a smaller lockbox for transporting her methadone, it was not locked or in the closet. The Agency advised mother to keep her portable box locked inside the closet lockbox at all times.

Mother also consistently attended her supervised visitation at a family center with J.D. She eventually progressed to four-hour unsupervised visits in the community near the children's various placements; later, she had ten-hour visits on the weekend. Though she appeared to resolve initial issues related to arriving late or completely missing supervised visits, the Agency social worker voiced concerns that the behaviors that resulted in J.D.'s removal were still present. Mother frequently externalized blame onto others for various issues she had when supporting her children. For example, when engaging in supervised visits, she did not want to continue visits at a certain host organization based on claims that it made false reports regarding her participation. But those reports simply documented mother's tardiness or failure to attend visits —13 times over the course of approximately three months.

Mother failed to make significant progress on other issues. At one point, she was at risk of losing her housing due to difficulties paying rent. The Agency referred her to a housing organization for rental assistance. It recommended she participate in a rapid rehousing program that offers financial support for families living in affordable housing and assists parents in finding stable employment. But mother expressed displeasure with the

5

recommendation, and she stopped communicating with it. The organization eventually closed her case based on its policy of terminating services if clients failed to communicate for more than 30 days. The Agency thus continued to have concerns about mother's ability to obtain and maintain a stable and suitable residence. Indeed, by the 18-month review hearing, mother had lost her housing.

General concerns regarding mother's ability to attend scheduled appointments also persisted. She canceled or rescheduled meetings at the last minute. The Agency social worker repeatedly attempted to contact mother by phone, but she failed to return messages. She expressed a preference to communicate through email, but she would send lengthy, meandering emails to the Agency that were difficult to decipher.

J.D. also demonstrated progress and setbacks during the reunification period. He was placed with a new caregiver. He improved his toileting and control over bowel movements, but he continued to display indications of sexual abuse, such as stating imaginary friends did inappropriate things to him in the shower. He attended school and an aftercare program, had an individualized education program, and special education services had been requested. But the Agency social worker reported J.D. — now six years old — had a mental health crisis. After a psychiatric visit during which he reported wanting to kill himself, he was placed on a psychiatric hold, diagnosed with disruptive mood dysregulation disorder and post-traumatic stress disorder, and prescribed medication to address his hyperactivity, impulsivity, and anxiety. He exhibited severe symptoms of trauma and neglect, stated that he no longer wanted to live, and expressed desires to kill his younger brother. He struggled in school — at one point, touching a

female classmate's breasts — and had difficulty following the rules in his placement home.

By April 2025, the Agency recommended that J.D. continue as a dependent in an out-of-home placement and reunification services be terminated. At a review hearing held over the course of several months, the Agency social worker expressed concerns that placing J.D. with mother would significantly increase mother's parenting responsibilities — a marked change from her visits that were, at the time, limited in time and frequency outside in the community. Indeed, the Agency asked mother to increase visitation to a full day so she could demonstrate her ability to care for the children for longer periods of time. But mother disagreed with that length of time because she was not available in the morning during weekdays. And though mother identified three people who could provide childcare support when she needed to be away from J.D., she failed to provide the Agency contact information for those individuals for verification. Moreover, J.D. often became dysregulated after visits with mother, particularly when the visits were longer and unsupervised.

An Agency social worker supervisor further reported mother's difficulties with time management during the unsupervised visitation. She struggled to arrive or drop the children back off on time. In one incident, she dropped off one child 50 minutes late. Another incident involved her car battery dying, and the caregiver having to pick up the child at 10:30 p.m., three hours after the scheduled return time.

The juvenile court found A.S. could be returned to mother's custody but returning J.D. and J.C. would create a substantial risk of detriment to their safety, protection, and physical and emotional well-being. For J.D., the court highlighted his history of suicidal ideation, statements about killing J.C., and

7

his significant psychiatric and developmental needs that required a high level of supervision that mother had not demonstrated her ability to address on a full-time basis. Mother, the court further explained, demonstrated a chronic lack of follow through with referrals, which was significant given the various important medical, psychological, and educational appointments J.D. required. The court terminated reunification services but did not set a permanency planning hearing because J.D. was not a proper subject of adoption or guardianship at that time.

## DISCUSSION

Mother contends there is insufficient evidence to support the juvenile court's detriment finding. Having reviewed this finding for substantial evidence — examining the record for any evidence, "contradicted or uncontradicted, which would support" the court's conclusion, resolving all conflicts and inferences in support of the order — we disagree. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212; *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).)

"The dependency scheme is based on the law's strong preference for maintaining family relationships whenever possible." (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.) It contains legal safeguards "to prevent unwarranted or arbitrary continuation of out-of-home placement." (*Ibid.*) Courts generally order reunification services to parents whose children have been removed from their custody to "facilitate the return of children to parental custody." (*In re Joshua M.* (1998) 66 Cal.App.4th 458, 470; *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112; § 361.5, subd. (a).) There is "a statutory presumption that a dependent child will be returned to parental custody" until the court terminates reunification services. (*Yvonne W.*, at p. 1400.)

8

Generally, reunification services are provided "for a maximum of 18 months after a child has been removed from parental custody." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625; § 366.22, subd. (a).) At the end of this period, the juvenile court must return the child to the parent's custody unless it determines return would create a substantial risk of detriment to the child's "safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1); *Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.) The Agency must demonstrate a substantial risk of detriment, a fairly high standard. (*Yvonne W.*, at p. 1400.) The party challenging the detriment finding must demonstrate it is not supported by substantial evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Mother contends there was insufficient evidence to support the detriment finding because she complied with and completed her case plan. While "the juvenile court must consider the extent to which the parent participated in reunification services," compliance with a case plan and services is not determinative. (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400; (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143; § 366.22, subd. (a).) Rather, the court must also "consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*Yvonne W.*, at p. 1400.) Substantial evidence supports the court's finding that mother has not achieved that here.

True, mother did make progress on her case plan — regularly testing negative for alcohol and drugs, eventually cleaning and organizing her home, progressing to unsupervised visitation. But as the juvenile court found, mother displayed a chronic failure to attend necessary appointments and complete referrals. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1342 [examining whether parent kept appointments when making

9

detriment findings].)  Even though she was at risk of losing her housing due to rental arrears, she failed to communicate with the housing agency specifically referred to her for rental assistance.  She eventually lost her housing.  She also regularly canceled or rescheduled meetings with the Agency, which stymied its ability to assess her progress towards reunifying with J.D.  (Compare with *id.* at pp. 1341–1342 [parent attended all individual counseling sessions, completed parenting course, participated in a parenting group, was in general compliance with case plan, "responded to comments, and kept [social worker] informed of pertinent changes"].)  This persistent issue is critical given J.D.'s significant psychiatric and educational needs.  As the Agency social worker noted, J.D. presented with the most severe symptoms of trauma and neglect, which necessarily required the most support when dysregulated.  (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 894 [reunification is not governed "solely by whether the parent has corrected the problem which required court intervention; rather, the court must consider the effect such return would have on the child"].)

Though mother progressed to unsupervised visits with J.D., that fact has limited value here.  J.D.'s caregiver noted that his challenging behaviors — difficulties following rules, participating in school — increased when unsupervised visits began.  Mother also demonstrated difficulties with time management — on more than one occasion, she was late in bringing the children back from the visits.  She further rejected the opportunity to increase her unsupervised visitation to full days because she was unavailable in the mornings, indicating she was not yet in a position to care for the children on a full-time basis.  (Compare with *Jennifer A. v. Superior Court*, *supra*, 117 Cal.App.4th at p. 1341 [mother permitted daily, unmonitored visits with children and there was no indication she would leave the children

10

unattended].)  While mother is "not required to demonstrate perfect compliance," the record reflects her myriad difficulties with caring for J.D., thus supporting the finding that reunification would be detrimental to his emotional well-being.  (*Id*. at p. 1343.)

Indeed, the problem here is qualitative — "deal[ing] with an evaluation of the *personality, character and attitudes* of the parent" — rather than simply complying with a case plan.  (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.)  Mother failed to internalize the issues that resulted in J.D.'s initial removal.  The Agency social worker noted that she frequently blamed external factors for various shortcomings.  She claimed that the supervised visitation family center made false reports regarding her engagement in visits, even though it was simply reporting that she was often late or failed to attend scheduled visits.  She failed to adhere to methadone storage protocols and continued to deny giving J.D. methadone to calm him, instead blaming his brother.  Nothing prohibited the juvenile court from assessing mother's lack of insight, contrary to her assertions.  (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 867.)

We reject mother's argument that the juvenile court erred because it considered the detriment to J.D. and J.C. together rather than individually.  (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 147.)  The record demonstrates otherwise.  Before making its determination, the court highlighted J.D.'s significant needs.  It discussed his repeated suicidal ideation, his desire to kill J.C., his psychiatric hospitalization, and specific diagnoses requiring medication.  It also noted his problems with schooling — including attempts to escape from school and his placement — developmental delays, and autism, thus acknowledging the high level of dysregulation.  It was against this background, including J.D.'s constant need for care, that the court

11

determined there was a substantial risk of detriment to J.D. if he was returned to mother's custody.  Substantial evidence supports the juvenile court's detriment finding.  (*Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.)

## DISPOSITION

The order is affirmed.

_____
RODRÍGUEZ, J.


WE CONCUR:


_____
FUJISAKI, Acting P. J.


_____
PETROU, J.


A175105; *In re J.D.*